[Crim. No. 13010.   Second Dist., Div. Three.   July 31, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. ROY EDRIC MATTHEWS, Defendant and Appellant.

Frank G. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Edward M. Belasco, Deputy Attorney General, for Plaintiff and Respondent.

COBEY, J.—This is an appeal, following a nonjury trial, from a judgment of conviction of burglary of the second degree in which probation was granted and from an order denying a new trial.[1] Such order is not appealable as such, but will be reviewed herein. (Pen. Code, § 1237, subd. 1.)

---

[1] The trial started as a jury trial but in the course thereof a waiver of his right to a jury trial was made by appellant. This waiver was taken "in chambers" following the trial court's ruling outside the presence of the jury that appellant's hereafter discussed extrajudicial statement to the police was admissible. In view of the presence at the time

The grounds for appeal are essentially that (1) the evidence of appellant's concomitant intent to commit larceny or any felony was insubstantial; (2) his extrajudicial, highly incriminating statement to the police was improperly admitted in evidence to his prejudice. We reverse solely upon the second stated ground.

## I. THE FACTS

On May 25, 1966, at 3:20 a.m., Mrs. Rosalee Frances McLean was awakened by an intruder in her bedroom in the apartment she shared with her husband in Long Beach. The intruder was appellant, Roy Edric Matthews, a career Navy enlisted man. Mrs. McLean screamed, appellant grabbed her by the throat but she managed to rise up in bed and start screaming for her husband. Appellant released his hold and fled through the well-lighted living room with Mrs. McLean in pursuit still screaming for her husband. Appellant ran into the kitchen from whence he escaped through a window above a sink. This window was the only means of external access to the apartment aside from the front door which had been chain-locked. Nothing was taken or missing from the apartment.

At approximately 4 a.m. that same morning two Long Beach police officers, searching for a prowler, observed appellant lying under a parked car in an alley a half block away from Mrs. McLean's apartment. One of them shined his flashlight directly into appellant's closed eyes and the other told him two or three times to get up. When appellant failed to do so but flinched his eyes, the two policemen, with the help of others who had joined them, lifted appellant out from under the car and stood him up in the middle of the adjoining backyard. At 4:10 a.m. another police officer advised appellant of his constitutional rights as required by *People* v. *Dorado*, 62 Cal.2d 338, 353-354 [42 Cal.Rptr. 169, 398 P.2d 361],[2] and placed him under arrest for burglary. Appellant was then apparently placed in jail.

During the next 30 hours or so, appellant was taken once and possibly twice from the holding tank to a Long Beach

of at least appellant, both counsel, and the reporter, this manner of taking appellant's waiver of his right to a jury trial was nonprejudicial error. (See *People* v. *Valenzuela*, opinion on denial of rehearing, 259 Cal.App.2d 826, 834 [66 Cal.Rptr. 825], hear. den.)

On the motion for a new trial, the degree of burglary was reduced from first to second. Otherwise this motion was denied.

[2]This advice was as follows: ''Officer Cornwell advised him of his rights to remain silent, anything he said could be used against him, and he had a right to an attorney.''

police interrogation room to be questioned. The sole reported interrogation during this interval of time was conducted by Inspector Bennett in the presence of Sergeant Johnson. It lasted approximately 10 minutes. Appellant was advised of his constitutional rights along the lines of the requirements of *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed. 2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], by Inspector Bennett who also had appellant repeat that advice to make sure he understood it.[3] Bennett then asked appellant whether he understood these rights, as Bennett had told him of them previously. Appellant replied that Bennett had not. Bennett became "rather hot about it" and commented "You have to get up early in the morning to fool me" or something like that. Appellant said he had been "brutalized." The two police officers told appellant to take off his clothing from the waist up. They inspected the exposed half of his body, particularly his back, about which they questioned him. Bennett then asked appellant, in a way which appellant regarded as insinuating his guilt, what had happened at the McLean apartment. Appellant would not talk and was therefore returned to the holding tank.

About 11 a.m. the next day, appellant was taken by the aforementioned Sergeant Johnson from the holding facility in the courthouse to the courtroom of Municipal Judge Lilley for arraignment. While waiting in the jury box following his arraignment appellant motioned Sergeant Johnson over and said, "I would like to clear things up," or something like that. Johnson told appellant to wait until court was over.

Appellant was arraigned before Judge Lilley in the presence and hearing of, among others, Sergeant Johnson. He was without counsel and the judge appointed the public defender to represent him. The judge also advised appellant of certain of his constitutional rights relating to his forthcoming trial.[4]

Immediately after the arraignment and without any consultation with his just-appointed counsel, appellant was taken by Sergeant Johnson to the police station across the street. There he gave Sergeant Johnson and a police secretary a five-

---

[3]This advice was as follows: "The Inspector informed the Defendant that he had the right to remain silent; he had the right to an attorney; he had the right to know that any statement he could make or would make could be used against him in any subsequent criminal proceedings; and, further, that he had the right to know that if, in the event he could not afford an attorney, that one would be provided for him by the courts."

[4]This advice was that "he had the right to a trial by jury or judge, of his own selection; he had the right to be confronted by his accusers; he had the right to have witnesses brought in to testify in his behalf, at no expense to him."

page statement, in question and answer form, which subsequently was introduced into evidence over objection as People's Exhibit No. 3.[5] After this statement had been typed up it was taken back to appellant in the holding tank to read and sign, page by page, which he did in the presence of Sergeant

[5]In its entirety this statement reads as follows:

"Victim McLean, Rosalie Frances (CR 704 119) Date May 26, 1966 Accused MATTHEWS, Roy Edric No. BN 507 242

Re: Statement of the above accused in regards to CR 704 119- Residential Burglary and Attempt Rape at 830 Elm Avenue Apartment #101 on May 25, 1966. Statement was given in Room 305—Felony Morals Detail—Long Beach Public Safety Building. Questions were asked by Sgt. L. Johnson Jr. and notes were taken by Barbra Bauhard at 11:15 AM on May 26th, 1966.

INTRODUCTION BY SGT. JOHNSON:

Sgt. Johnson had taken the above suspect out of the 2-D Holding Facility in the court house just prior to 11:00 AM and took him before Judge Lilley in Department #4 for arraignment on a charge of burglary. Suspect Matthews informed the sergeant that he wished to make a statement and help clear this matter up. He has been previously advised of his Constitutional Rights and also has been advised by the judge at the time of arraignment.

Q: Roy Edric Matthews; is that your true name?

A: Edric—"E-D-R-I-C"—Roy Edric Matthews.

Q: Would you relate to me briefly what caused you to enter the house through the window—the house belonging to Rosalie McLean at 830 Elm, Apartment #101.

A: Really I couldn't tell you exactly what made me do it. My attention was drawn to the screen which was torn or ripped. Earlier that evening I'd been drinking and had left around 2:00 or slightly after from Anaheim Street, with the intention of going back to the base so I could be ready for regular duties the next morning.

The Navy has been more or less a hassle for the past four months and I wasn't really thinking right at the time. I was confused and depressed from a number of things pertaining to the Navy. I have no real reason for entering the apartment. I believe it could have been curiosity or something subconsciously—but really, I don't really know.

But when I entered I had no thought of taking anything or harming anyone. After I entered——

Q: How?

A: Through the kitchen window. I remained in the kitchen for a number of moments deciding whether to go ahead through the house or leave because I was questioning myself about what was I really doing here.

I continued through the house and I looked around. I browsed and admired the furniture—this is strange, and then I entered one of the rooms and it was dark. I hadn't noticed anyone at all, but there was a movement on one of the beds. I stood still. I was about to turn around and there was another movement and I stood quiet again. Suddenly this person sat up where the movement was and attempted to say something. I reached out and I believe I grabbed this person for a number of seconds. The person continued saying something; then I immediately turned and fled.

I had lost a pair of glasses—prescription. When I discovered that I lost them I was about six blocks away and I turned around to return to find them; I discovered the officers there. I stopped in the alley, gangway, or yard, and sat down and I dozed off. When I came

Johnson and a Navy chief petty officer who was the liaison between the Navy and the Long Beach police and who was requested by Sergeant Johnson to witness appellant's signatures.

to I was about ten feet away from where I previously sat down. My possessions were laying out on the grass and about six or eight officers were standing over me.

Well, a flashlight was shown in my eyes and I became conscious of what was happening but I wasn't immediately awakened at the time. After the light was shown in my eyes I stretched. When I stretched the officer made a comment, 'You aren't really asleep.' I got ready to turn over and the officer kicked my arm down and then another officer kicked me in the crotch. I yelled—'I just had an operation for a hernia' so the officer immediately stopped kicking me. But really, I hadn't had an operation, this was just to stop him. So I was apprehended and brought to the police department at about 5:00 o'clock.

Q: Now, the victim in the apartment stated at the time of the report to the officers that you had grabbed her and put your hand over her mouth in an attempt to stop her from screaming, is that correct.

A: That might be, because I reached out in a motion to quiet her. Immediately after—two or three seconds—I released her because I realized I was wrong for being in there and I didn't want to make it from bad to worse.

Q: How did you leave the apartment?

A: I went out the window I entered.

Q: You stated earlier in the statement that you were depressed and distraught in your attitude concerning the Navy.

A: To a certain extent. Having had been drinking I wasn't really thinking straight.

Q: How much had you had to drink?

A: Between 8:00 and midnight I drank a pint of Hiram Walker's. From there on out I was continualy drinking beer until about 2:00.

Q: Is there any other reason you could give for committing this crime?

A: Only the way I think—the attitude that I had toward the Navy and everything.

Q: Is there anything more you care to say in regards to your condition of thinking?

A: A number of things was on my mind more or less for the past four months since I've been to the west coast—since about January. When I was on the east coast everything ran smoothly while I was in the Navy. Then, when I came to the west coast things just seemed to be completely different in the entire Navy. Ship life was different. There was a number of adjustments to make. On ship petty officers carried much more weight; they were different types of individuals—different people with different types of attitudes, different purposes and objectives. And me not being a rated person it was rather hard to adjust to other people other than adjust to the situation.

I was transfered a number of times with the intention of setting up installation aboard ship for my rate which is a Navy Accountant dealing with data processing and E.A.N. equipment. So it has been more or less a hassle back and forth because nothing substantial has come out of my transfers back and forth. I haven't been working in my rate and the training that I received I have not had an opportuntiy to put it to use on the west coast.

I was rather optimistic for the Navy and the training they had to offer when I first got in but as time goes on things look more and

In the statement, appellant admitted that he had entered the McLean apartment through the torn screen of the kitchen window after having drunk a pint of whiskey and some beer earlier that night; that he did not know why he did so, that he continued through the house into a bedroom where a person awakened whom he attempted to quiet unsuccessfully, that he then fled but returned to the vicinity of the apartment looking for a pair of glasses which he had lost, that he saw the

more dim. One reason is I have a leading first class that won't recommend me for the E-4 exam and I missed it twice already due to being transfered and temporary duty and I haven't had an opportunity to get my courses out. I had the intention of being E-5 Second Class before this enlistment was up, but not being recommended it made things look a little bit worse and I have to cope with him until the middle part of 1967 when he gets out.

Q: O.K. Did you take anything from the apartment?

A: I haven't taken anything. The only thing I really touched was the sink and the window and that was it.

Q: And the victim?

A: And the victim but I don't think that I hurt her.

Q: Is this a true statement to the best of your recollection?

A: It is a true statement.

Q: Have you been previously advised of your Constitutional Rights?

A: I was advised but my mind wasn't too conscious at the time.

Q: Do you recall being advised in this office by Inspector Bennett and myself yesterday?

A: Yes, I recall that.

Q: Has there been any promise of reward or immunity in order to get you to make this statement.

A: No there hasn't.

Q: Would you be willing to sign this statement after it has been recorded into typewritten form as a true and voluntary statement.

A: Yes I would, but there was another thing I wanted to add. I haven't seen my brother for awhile. He is Airborne 139 in the Army and he was home on leave about a week or so ago. He is scheduled to be gone to Viet Nam within a month or so. Realizing what danger he could possibly be going to, I wanted to take leave at the time also. I have a number of friends killed over there all ready. By him going to the same situation or more dangerous, I wanted to go home to be with him for awhile because there is always a possibility it might be the last time. Also I want to go home because at this particular time of the year the river terminal is busy longshoreing and stevedoring and for the length of time that I would be home with my brother I would have had the opportunity to make a great deal of money working there. But my leave was refused and I was scheduled to be transfered to the Naval Supply Center.

I was transferred to the Naval Supply Center on the 24th to be a key punch operator for about two months.

The Navy pulled my teeth about March and I haven't had the opportunity to get these dentures replaced and it is quite embarrasing not to have any teeth and the amount of teeth that I do have it is quite hard to eat with.

STATEMENT ENDED AT 11:45

/s/ Roy E. Matthews

DEFENDANT

/s/ Les Johnson/N. I. Salter

WITNESS''

police and then dozed off and was subsequently awakened by them. The deputy public defender objected to the admission of this statement on the ground that the People had not shown an effective waiver by appellant of his right to counsel before he made the statement.

## II. The Question of Appellant's Felonious Intent.

■ Turning to appellant's first contention on appeal, that the evidence of his felonious intent in entering the McLean apartment is insubstantial, we find it to be without merit. Appellant claims that he was so intoxicated that he did not know what he was doing when he climbed into the kitchen window. It is true that appellant had consumed a pint of whiskey and some beer during the evening hours before he was discovered in Mrs. McLean's bedroom and that a breathalyzer test by the police shortly after his arrest showed that the alcohol content of his blood was then .10. Moreover, appellant testified that he was intoxicated when he entered the apartment and did so without intent to commit larceny or rape. But one of the arresting officers testified that in his opinion, appellant was not drunk at the time of his arrest.[6] This occurred within an hour of his entry into the apartment. Furthermore the trier of fact could properly infer from the time and the apparent manner of appellant's entry into the apartment[7] that he possessed a felonious intent at the time of such entry.

## III. The Nonadmissibility of Appellant's Statement.

■ Appellant's highly incriminating statement to the police was taken by means of an interrogation immediately following his arraignment and the appointment of the public defender to represent him. The taking of this statement was occasioned by appellant's expressed desire "to clear things up" in the mistaken belief that he was not guilty of the crime with which he had just been formally charged. Under these circumstances, the question presented is whether appellant's statement was a voluntary self-incriminating statement beyond the protection of the constitutional privilege against

---

[6]He based this opinion upon the fact that although, when arrested, appellant had a slight but obvious odor of alcohol on his breath he did not sway or stagger, his eyes were not bloodshot or watery and displayed fairly quick reaction to the flashlight, and his end of the conversation was carried on in a normal tone.

[7]At the time of his arrest a small straightedge razor was taken from appellant's pocket. It showed evidence of recent use.

compulsory self-incrimination and the safeguards of *Miranda v. Arizona, supra,* 384 U.S. 436.[8]

, To answer this question we must determine whether appellant's statement was the product of a "custodial interrogation" as that term is defined in *Miranda.* This is so because, while *Miranda* recognizes that "voluntary statements" are admissible without its safeguards,[9] "no statement may be deemed "voluntary" if it is the product of a custodial interrogation carried on in the absence of those safeguards. Thus we turn to *Miranda's* definition of "custodial interrogation" and to its applicability to this case.

The definition is simple enough. At page 444 [16 L.Ed.2d at p. 706] the Court states: "By custodial interrogation, we mean *questioning initiated* by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (Italics added.) The difficulty in this case is that the suspect volunteered "to clear things up." All of the elements of a custodial interrogation were present unless it be said that appellant, rather than the police, *initiated* the questioning. Thus the critical question becomes whether the word "initiated" was used in the *Miranda* definition in the sense of "occasioned" or "begun."

We think "initiated" was used by the Supreme Court in its primary meaning of "begun"[10] and that there is no escape from the fact that Sergeant Johnson began the questioning in this case. Appellant had stated that he wanted "to clear things up" but it was Sergeant Johnson who independently decided to take appellant back to the police station and to question him in the presence of a police secretary. What ensued was a custodial interrogation under *Miranda.*

---

[8] These safeguards apply, timewise, under *People v. Rollins,* 65 Cal.2d 681, 686 [56 Cal.Rptr. 293, 423 P.2d 221]. *Rollins* was rendered almost six months after the trial of this case which, however, occurred about two months after the decision in *Miranda.*

[9] *Miranda* states at page 478 [16 L.Ed.2d at p. 726]: "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of the warnings and counsel, but *whether he can be interrogated.* There is no requirement that the police stop a person who enters a police station and states that he wishes to confess to a crime, [fn. citation omitted] or a person who calls the police to offer a confession or any other statement he desires to make. *Volunteered statements* of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." (Italics added.)

[10] See Random House Dictionary, Unabridged, (1966 ed.); Webster's New International Dictionary, Unabridged, (2d ed. 1942).

At first blush it may appear that to apply *Miranda,* as we do, to a statement essentially offered[11] by a prisoner but which is elicited in question and answer form by a police officer is to place form over substance. If the police officer merely listens and records, the statement is "voluntary"; if he questions the prisoner, the statement is part of a "custodial interrogation" and will be "involuntary" if *Miranda's* safeguards are not completely followed. But where the questioning is of the type involved here this difference is more than one of mere form; it goes to the root of the policy behind *Miranda.*[12] If, without questioning, a prisoner volunteers a statement and the police simply listen and record (or ask a neutral question such as "What do you want to say?")[13] the statement is wholly voluntary. Anything the prisoner then says is plainly only that which he wants to say; his statement is entirely voluntary both in its origin and in its making. The police role is purely passive and there is no exercise by the police of the compulsion and pressure which *Miranda* found to be inherent in all custodial interrogation.

On the other hand, if the police choose to question the prisoner who has offered to make a statement they may well elicit more incriminating matter than the suspect would have volunteered. Their role has ceased to be passive and the statement produced by their interrogation is not likely to be wholly the prisoner's.[14]

---

[11]This, of course, states the case in the manner most favorable to the prosecution. It is not completely clear that appellant was offering to make a statement. (Cf. *People* v. *Chaney,* 63 Cal.2d 767, 770 [48 Cal.Rptr. 188, 408 P.2d 964].)

[12]See *Miranda* v. *Arizona, supra,* 384 U.S. 436, 478 [16 L.Ed.2d 694, 726]: "The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of the warnings and counsel, but *whether he can, be interrogated.* . . . ¶ To summarize, we hold that when an individual is taken into custody . . . and is *subjected to questioning,* the privilege against self-incrimination is jeopardized." (Italics added.)

The California cases apparently recognized this principle even before *Miranda.* See *People* v. *Dorado,* 62 Cal.2d 338, 354 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Chaney,* 63 Cal.2d 767, 769-771 [48 Cal.Rptr. 188, 408 P.2d 964]; *People v. Gilbert,* 63 Cal.2d 690, 697-700 [47 Cal. Rptr. 909, 408 P.2d 365]; *People* v. *Cotter,* 63 Cal.2d 386, 393 [46 Cal.Rptr. 622, 405 P.2d 862]. Professor Graham agrees. See Graham, *"What is 'Custodial Interrogation'? California's Anticipatory Application* of *Miranda* v. Arizona, 14 U.C.L.A. L.Rev. 59, 80-83, 93, 100-101.

[13]See *People* v. *Treloar* (1966) 64 Cal.2d 141, 147 [49 Cal.Rptr. 100, 410 P.2d 620]; *People* v. *Tomita* (1968) 260 Cal.App.2d 88, 92 [66 Cal.Rptr. 739]; *People* v. *Sturdy* (1965) 235 Cal.App.2d 306, 316-317 [45 Cal.Rptr. 203].)

[14]In this case, there may have been a further element of compulsion in the signing of the statement when appellant, a career Navy enlisted

Accordingly, we hold that appellant's statement by reason of the manner in which the police obtained it was not an entirely voluntary statement nor a volunteered one within the meaning of *Miranda*. ▌ Therefore it was necessary for the People in this case to meet a heavy burden of proof to establish the admissibility of this statement by showing that appellant, before making this statement, knowingly and intelligently waived his privilege against compulsory self-incrimination and his right to the presence of his court-appointed counsel. (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 475 [16 L.Ed.2d 694, 724].) This burden involved essentially proof that the police gave appellant full and timely warnings with respect to these two constitutional rights and that he then made an affirmative waiver of such rights before he made the statement under consideration. (384 U.S. 436, 475 [16 L.Ed. 2d 694, 724].)

The record here leaves much to be desired in these respects. The trial court was under the erroneous impression that the *Miranda* requirements did not apply to appellant's interrogation because such interrogation occurred before the date of that decision and because appellant had received at least three different warnings as to his constitutional rights prior to the making of his statement. Consequently it unduly limited defense counsel's inquiry into this area.

The warnings which were given appellant prior to his making the statement appear to have been deficient in at least two respects. Each of the warnings, with the possible exception of the second one, was inadequate in content. The first warning,[15] which was given appellant on the occasion of his arrest, was, regardless of his condition at the time, plainly insufficient in its coverage. (See *Miranda* v. *Arizona, supra,* 384 U.S. 436, 444, 479 [16 L.Ed.2d 694, 706, 726].) The third and last warning, given at the time of appellant's arraignment and upon which the trial judge particularly relied, was not directed toward custodial interrogation at all but was instead quite properly directed toward appellant's constitutional rights *at the trial.*[16]

The second warning, given by Inspector Bennett the day before appellant made his statement, was generally sufficient

man, was *asked* to sign the statement in the presence of a chief petty officer who was the Navy liaison with the Long Beach police.

[15]This warning is set forth in full in fn. 2 to this opinion.

[16]This warning is set forth in full in fn. 4 to this opinion. It was completely inadequate under *Miranda.*

in coverage,[17] but failed to make clear that appellant was entitled *to the presence* of his counsel before and during any custodial interrogation. (See 384 U.S. 436, 444, 471, 473, 479 [16 L.Ed.2d 694, 706, 721, 722, 726].) In any event, regardless of the sufficiency of this particular warning, the police failed to give appellant any warnings whatsoever just prior to taking his statement the next day. ▮ A *contemporaneous* warning is required under *Miranda* at the outset of *each* interrogation. (See 384 U.S. 436, 469 [16 L.Ed.2d 694, 720].)

Moreover, prior to making his statement, appellant never *affirmatively waived* his constitutional rights to remain silent and to be represented by counsel. It is true that he repeated Inspector Bennett's warnings the previous day but he said then that he did not understand them. ▮ Under *Miranda,* silence in the face of the warnings, even if then followed by the making of a statement, is not enough to establish a knowing and intelligent waiver of these rights by the maker of the statement. An affirmative waiver is required. (See 384 U.S. 436, 475 [16 L.Ed.2d 694, 724].)

Finally we come to the failure of the police to afford appellant a reasonable opportunity to consult with his court-appointed counsel, the public defender, before interrogating him when they knew of such appointment. In *Miranda* it was pointed out that the action of the police in *Escobedo* v. *Illinois,* 378 U.S. 478, 480-482 [12 L.Ed.2d 977, 980-981, 84 S.Ct. 1758], in preventing Escobedo's attorney from consulting with him before he made his statement, in and of itself constituted a violation of Escobedo's Sixth Amendment right to the assistance of counsel and excluded any statement obtained in its wake. (384 U.S. 436, 465 fn. 35 [16 L.Ed.2d 694, 718].) Here, by whisking appellant across the street to the police station for interrogation immediately following the appointment of the public defender as his counsel, the police prevented the public defender from consulting with appellant before he made his statement.[18] But in this case, unlike *Escobedo,* neither appellant nor his counsel attempted in any way

[17]This warning appears in full in fn. 3 to this opinion. It was with respect to the content of this warning that the trial court unduly restricted defense counsel's inquiry.

[18]In fairness to the police it should be pointed out that the events (aside from the trial) which we have described in this opinion all occurred before the date of the decision in *Miranda,* June 13, 1966. Furthermore the intervention of appellant's counsel might well have resulted in appellant either refusing to make the type of statement he did or any at all because his attorney would have undoubtedly advised him of the error of his belief that he had not committed the crime of burglary.

to contact each other before appellant made his statement. In view of these circumstances and the other already discussed failures by the police and the trial court to comply with the requirements of *Miranda,* we need not decide whether the conduct of the police in this respect constituted an independent violation of appellant's Sixth Amendment right to counsel.

■ Having found that the admission of appellant's statement in evidence constituted federal constitutional error, we must now decide whether we can declare our belief beyond a reasonable doubt that this error did not contribute to the trial court's finding of guilt. (*Chapman* v. *California,* 386 U.S. 18, 22-24 [17 L.Ed.2d 705, 709-710, 87 S.Ct. 824].) It is true that appellant testified on the stand to much of what he had already told the police in his statement, but he did so only after the statement had been admitted in evidence over his objection. Under these circumstances it is clear that the admission of the statement impelled his like testimony on the stand and therefore, such testimony must be disregarded by us in deciding whether this federal constitutional error constituted reversible error under *Chapman.* (Cf. *People* v. *Stockman,* 63 Cal.2d 494, 502 [47 Cal.Rptr. 365, 407 P.2d 277]; *People* v. *Spencer,* 66 Cal.2d 158, 163-169 [57 Cal.Rptr. 163, 424 P.2d 715].)

We conclude that under *Chapman* the admission in evidence of appellant's statement constituted reversible error.

The judgment is reversed. The purported appeal from the order denying appellant's motion for a new trial is dismissed.

Moss, J., concurred.

Ford, P. J., concurred in the judgment.

Respondent's petition for a hearing by the Supreme Court was denied September 25, 1968. Mosk, J., was of the opinion that the petition shoud be granted.