[Crim. No. 14401. Second Dist., Div. One. June 26, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. HUEY PEARCE LONG, Defendant and Appellant.

Donald F. Roeschke, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Larry Ball, Deputy Attorney General, for Plaintiff and Respondent.

WOOD, P. J.—Defendant was accused of murder. He admitted allegations of the information that he had been convicted previously of two felonies (assault with deadly weapon and robbery). In a jury trial he was found guilty as charged. He was sentenced to imprisonment for life. His notice of appeal will be regarded as an appeal from the judgment.

Appellant contends that the court erred in receiving evidence of his alleged confession, and erred in failing to give, upon its own motion, an instruction regarding the law as to diminished capacity.

On December 28, 1966, Harry Munroe was murdered at the house of Elaine Robertson, his common law wife, at 2076 East 114th Street in Los Angeles. His death was caused by a shotgun wound in the brain.

Elaine Robertson testified in substance as follows: On December 28, 1966, about 6 p.m., Harry was watching television at the house, and she was ''upstairs.'' She heard a knock on the front door, and heard Harry say, ''Hey, man.'' A male voice replied, ''Hey,'' and then she heard a shotgun blast. She ran downstairs and saw Harry lying on the floor about ½ foot from the front door. A hole was in his head, and he appeared to be dead. The front door was open and she looked outside, but it was dark and she did not see anyone. In

the morning of that day, Harry had come into the house with a gun (Exhibit 2, .38 caliber revolver). She had never seen him carry a gun before. About 2:30 o'clock in the afternoon of that day, she saw a man standing outside a car which was parked about a half-block from the apartment. The man, who was wearing a green, three-quarter-length jacket (Exhibit 6), resembled the defendant.

Officer Williams testified that on December 28, 1966, about 6 p.m., he went to the apartment at 2076 East 114th Street; a male Negro (Munroe), who was dead, was on the floor; six .38 caliber cartridges were in his possession; Munroe's automobile was parked in front of the apartment; Officer Thomas searched the automobile and found a .38 caliber revolver (Exhibit 2) under the front seat.

Officer Larson testified in substance as follows: On December 28, 1966, about 11:20 p.m., he and Officer Riley arrested defendant Long at his residence. When defendant was arrested, he was advised that he had a right to remain silent, a right to an attorney, that if he could not afford an attorney one would be appointed for him, and that anything he said could be used against him in court. Defendant said that he knew his rights. Thereafter the defendant did not ask for an attorney. At the time of the arrest, the defendant was standing, walked naturally, did not stagger, spoke clearly, and talked to his wife. Defendant had been drinking, but he was not drunk, and did not appear to be under the influence of anything, or to be "loaded" on pills or whisky. Defendant made a statement that he did not know anything about the shooting in Watts, and that he had been home all day. About 9 a.m. on December 29 (about 9 hours after arrest), when he (officer) saw defendant again, he asked defendant whether he had had breakfast. Defendant replied that "they brought it but he couldn't eat that slop." At 5:30 p.m. on December 29 (about 18 hours after arrest), he and Officer Riley had another conversation with defendant. They did not advise him again of his rights. The conversation was recorded, and the recording is an accurate reflection of the conversation. (The recording was received in evidence and played in the presence of the jury.)[1] During the conversation, defendant (according to Officer Larson's testimony) said that he had spent the night prior to the murder at a motel with Barbara, Brenda, and Slim (Munroe); when he awakened, someone had stolen

[1]The recording has not been included in the record on appeal. It appears that parts of the recording did not reproduce clearly.

his gun (.38 caliber revolver, Exhibit 2), and he accused the girls and Slim of having stolen it. Defendant also said that he had thrown the shotgun into a vacant lot. A few hours after the conversation, defendant and the officers went to the lot, which was about 5 blocks from the house where Munroe had been murdered. They searched the lot approximately 45 minutes—weeds were on the lot, the night was dark, and they could not find the shotgun.

Ron Horlacher, a hearing reporter for the police department, testified in part that he recorded the conversation of the defendant and Officers Larson and Riley, and he made a transcription of the recording; and the transcription is an accurate reproduction of the recorded conversation. Mr. Horlacher read the transcription in court. Part of the transcription includes a statement by the defendant, as follows: "Anyway when I woke up that morning, why I took Bob [Barbara] and Brenda home. He wasn't there because I was in my car then. So I took him home. So see all day, see, I took the girls downtown all day. So I had my shotgun in the car all day. So that evening I was going down to my cousin's house and I seen him. So I went around the block in my car, and I came and knocked on the door. So he came to the door, and I said, 'I'll take my gun with me.' and he said, 'I ain't got your gun.' and he walked away and I shot him." Defendant then said (in transcript), in response to Officer Riley's question as to why defendant was carrying the shotgun around, "Well, you know, I was thinking all the time that he had my gun. I started to shoot him that night."

Pursuant to stipulation, portions of Officer Riley's testimony at the preliminary examination were read in evidence at the trial. Part of his testimony was to the effect that after defendant had been advised of his rights, he "did" ask for an attorney. Officer Larson, who had been present at the examination, testified that Officer Riley had testified that defendant "did not" ask for an attorney. Mr. Jacobowitz, the deputy district attorney at the preliminary examination, testified in substance (at the trial) that Officer Riley had testified that defendant did not ask for an attorney. The judge said that he was persuaded that there was an error in the transcript—that someone made an error in writing up the transcript.

Officer Oliver testified in part that he was present "throughout the entire time that defendant was advised of his constitutional rights"; defendant did not at any time request the

assistance or presence of counsel; and when defendant's wife told defendant that she was going to get a lawyer, defendant said, ''Don't bother, I don't need a lawyer.''

Defendant testified in substance as follows: On the day of the arrest he had drunk ''a fifth and a half of wine'' and had taken a dozen Red Devil pills. When he was arrested, about midnight, he was in bed ''trying to sleep off the influence of these pills and this wine.'' When his wife told him that the officers were there, he was groggy and did not know what was happening. He was tongue-tied and drunk. He told the officers that he wanted a lawyer. The officers took him to the police station. After his arrival there and until the conversation about 5 p.m. the next day, he slept most of the time. During that time, he did not have anything to eat, he was not allowed to talk to anyone on the telephone or to see his family, and he told the officers several times that he did not know anything about the shooting. He was still tired and sleepy when the conversation occurred. No one offered him breakfast in the morning after his arrest. They offered him some food once, but to him ''it wasn't any food . . . it was just like a water mixture.'' He did not ask for a lawyer again because he figured once was enough. He would not have had the conversation if the officers had advised him of his constitutional rights. Prior to the conversation he told the officers that he was hungry and tired, and wanted to go home. They said they would take him out to eat when they got through. After the conversation, the officers took him out for a hamburger, a malt, and some french fries. He did not know Munroe and had only seen him briefly on the ''night before'' at Brenda's residence. He did not shoot Munroe. He did not own the .38 caliber revolver, and had never seen it until the officers showed it to him. He did not own any shotgun. He is an ex-felon, and it is a crime for an ex-felon to own a gun. On December 28, 1966, he was with a friend named Sahara. He does not know where Sahara lives, and does not know where his wife is.

██ . Appellant contends that the court erred in receiving in evidence statements he allegedly made to the officers. He argues that such evidence was inadmissible under the requirements of *Miranda* v. *Arizona* (384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]). He also argues that the statements were made after defendant had been in custody 18 hours without having anything to eat.

Prior to impaneling the jury, the judge conducted a hear-

ing on the issue as to whether the statements should be received in evidence. The officers and defendant testified at the hearing, and their testimony on that issue was in substance the same as their testimony hereinabove set forth. There was evidence that after defendant was arrested, he was advised that he had a right to remain silent, a right to an attorney, that if he could not afford an attorney one would be appointed for him, and that anything he said could be used against him in court. That admonition was sufficient under the requirements of the *Miranda* case. It was not necessary that defendant be readvised of his rights, on the following afternoon, when he made the statements. (See *People* v. *Sievers*, 255 Cal.App.2d 34, 37-38 [62 Cal.Rptr. 841]; *People* v. *Perrin*, 247 Cal.App.2d 838 [55 Cal.Rptr. 847].) Defendant said he understood his rights. He testified that he asked for an attorney. The officers testified that he did not ask for an attorney. There was also evidence that defendant told his wife that he did not want an attorney. The credibility of the witnesses was for the determination of the jury.

Defendant argues that his statements were not free and voluntary. Officer Larson testified that they were made freely and voluntarily. Defendant testified that he did not have anything to eat from the time of his arrest (about midnight) until he made the statements (about 5:30 p.m. on the following day). Officer Larson testified that defendant had refused a proffered breakfast and had said that it was "slop." Defendant testified that breakfast was not offered to him; however, he admitted that food was brought to him once during the day, but he refused it because, according to his opinion, "it wasn't any food . . . it was just like a water mixture." Defendant also testified that he had spent most of his time (between arrest and statements) sleeping. Whether or not the defendant had been deprived of food was a question of fact for the determination of the jury. The court did not err in receiving in evidence the statements of defendant which were made to the officers.

Appellant contends further that the court erred in failing to give, upon its own motion, an instruction regarding the law as to diminished capacity. Such an instruction was not requested. Instructions were given defining "murder," and "malice aforethought." The defense was predicated upon an alibi—that he did not know the victim, did not shoot him, and was with someone else at another place when the

murder occurred. His defense was not predicated on alleged diminished capacity. (See *People* v. *Owens,* 79 Cal.App.2d 290, 299-300 [179 P.2d 401].) The only evidence relating to diminished capacity, that is, that defendant was under the influence of liquor or drugs, was defendant's testimony on the issue as to whether his statements to the officers were admissible in evidence. On that issue, Officer Larson testified that defendant did not appear to be under the influence of anything—or pills or whisky at the time of the arrest (about 6 hours after the murder). Under the circumstances herein, the court was not required to give, upon its own motion, an instruction regarding diminished capacity. The case of *People* v. *Henderson,* 60 Cal.2d 482, 491 [35 Cal.Rptr. 77, 386 P.2d 677], wherein the failure to instruct on diminished responsibility is discussed, is factually distinguishable from the present case.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 21, 1968.