[Crim. No. 4970. Fourth Dist., Div. Two. June 18, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK ALLEN JOHNSON, Defendant and Appellant.

990

Raymond T. Sharp, under appointment by the Court of Appeal and Sharp & Sharp for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Daniel J. Kremer and Mark L. Christiansen, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GABBERT, J.**—Following a non-jury trial, defendant Mark Allen Johnson was convicted of violating Penal Code section 187—committing second degree murder. Now appealing, Johnson alleges the trial court committed error by its rulings: (1) that he was duly advised, at all relevant times, of his constitutional rights; (2) that confessions and admissions given by

him were not the product of improper inducement; and (3) that interrogations of him made while he was under the influence of sodium amytal, a truth drug, were admissible. Defendant asserts the above rulings are in error since the "totality of circumstances" indicates the involuntary nature of his statements to the authorities.

About noon June 17, 1970, defendant Johnson, a Marine, returned to his civilian apartment at San Clemente after having spent the preceding day and one half on duty at the military base in El Toro, California. Upon entering his apartment, Johnson discovered his wife's mutilated and lifeless body lying crosswise on the bed. He immediately summoned police assistance and explained to the first arriving patrolman: "It's my wife; I think she's hurt."

At 7:15 p.m. that evening Dr. Katsuyama, a qualified pathologist, did an autopsy on the body of Johnson's wife. He estimated she had been dead for at least 18 hours (but not longer than three days) and that death had probably occurred three to six hours after a meal which included corn. The examination revealed that, in addition to multiple stab wounds, the victim had suffered a fractured skull caused by blows with a blunt instrument, possibly a bar stool. The doctor testified the blows to the victim's head, which probably rendered her unconscious, were sufficient to cause death, though not immediately. The knife attack, which apparently took place while the victim was unconscious, involved use of a weapon, never found, which was estimated to have been a sharp knife with a four- to six-inch blade.

Defendant Johnson was neither charged nor arrested in the 12 months immediately following the homicide, even though some circumstantial evidence tended to indicate he was the perpetrator. This circumstantial evidence included, among other things, a statement by Betty Wylie, a neighbor, that she last saw Mrs. Johnson alive at approximately 8 p.m. on June 15, 1970. At that time both the Johnsons were home, and Mrs. Johnson was preparing a dinner consisting of cornish game hens and corn. Later that evening, at about 12:20 a.m. Donald Simpson, another neighbor, heard an argument between a man and woman wherein the woman yelled two or three times, "Don't hit me anymore." Though he then went outside his apartment to investigate, Mr. Simpson was unable to tell where the voices were coming from. Later that morning, beginning at roughly 6:50 a.m., Mrs. Wylie telephoned Mrs. Johnson several times, but always failed to receive an answer. (Defendant had left the apartment earlier—at 4:30 a.m.—in order to report for duty as a military policeman.) Mrs. Johnson's body was not found until approximately noon the following Wednesday, when Mr. Johnson returned from duty and phoned the police.

In April 1971, Frank Oxandaboure, an investigator for the Orange County District Attorney's office, was assigned to the case. Upon reading the police reports, Oxandaboure learned that the defendant had indicated a willingness to see a psychiatrist concerning the death of his wife. Oxandaboure accordingly arranged to meet defendant on June 10, 1971, at the El Toro base. After advising the defendant of his rights per *Miranda,* and receiving a waiver of those rights, Oxandaboure ascertained that the defendant was still willing to see a psychiatrist.

On Monday June 14, 1971, defendant met with Dr. Lindauer, a psychiatrist, employed by the People, for the first of seven major interviews (totaling 28-30 hours) which were to take place over a nine-day period, concluding on June 22, 1971. For all these interviews, with the exception of the last, the defendant was provided with transportation from the base to the doctor's interview locale by police officers. The defendant was not, however, either placed under arrest or taken into custody until after having undergone a sodium amytal interview on June 21, 1971. Prior to that time, the defendant was told, on numerous occasions, he could talk or not talk to the psychiatrist as he chose, but if he did talk to the psychiatrist the contents of his interviews would be relayed to the Orange County prosecuting officers and would, in appropriate circumstances, be used against him in court.

The first four psychiatric interviews occurred on a daily basis from June 14 to June 17, 1971. The record is clear that, as the Monday, June 14 interview was scheduled to begin, Johnson again had his rights explained to him. The record is less certain, however, as to whether Johnson was readvised prior to the Tuesday, Wednesday, or Thursday interviews.

These first four interviews between Johnson and Dr. Lindauer focused primarily on Johnson's past history and his dreams. Insofar as the record indicates, Johnson made no remarks which could reasonably be deemed either admissions or confessions. Rather, he exhibited confusion as to precisely what events did occur on the night of June 15-16, 1970. This confusion, which was accompanied by vague guilt feelings, is expressed by Johnson as follows: "I don't know if I did it or not, but I don't recall ever having done it, I am beginning to wonder if I did, since so much points to me as the one who did. Maybe I did it, but I don't know. Maybe this is because of all the pressure which points to me."

Indicative of the paucity of incriminating statements which Johnson made to Dr. Lindauer over the first four interviews is the fact that, all things considered, Dr. Lindauer concluded the most damaging evidence adduced was Johnson's description of a dream which he had on the anni-

versary of his wife's death. This dream involved Johnson in the process of cutting down a big tree with pruning shears. Johnson found he needed only two whacks to fell the tree. In describing the incident to Dr. Lindauer, Johnson explained it was something he "had to do." The psychiatrist interpreted this dream as being indicative of Johnson's guilt, with the tree standing for Johnson's wife and with the two whacks of the pruning shears standing for the blows that Johnson gave his wife with the bar stool. The psychiatrist also noted with interest Johnson's mention that the time of the chopping incident was 12:45. As noted above, Mr. Simpson, a neighbor of the Johnsons, heard a woman scream "Don't hit me anymore" at approximately 12:20 on the night of the homicide.

A fifth psychiatric interview occurred on Friday, June 18, 1971. Since the defendant had been inquiring about possible penalties for the offense, Dr. Lindauer invited Oxandaboure to come to the interview and explain such facts to the defendant. Dr. Lindauer stated that Oxandaboure discussed the possible consequences involved if Johnson were convicted of first degree murder, second degree murder, manslaughter, or if he were acquitted. Dr. Lindauer also explained that Oxandaboure stated a murder charge would be filed against Johnson next week whether or not he confessed prior to then. Also, Dr. Lindauer heard Oxandaboure state "Of course, we don't want a false confession." Johnson, by contrast, claims that Oxandaboure, at this interview, made improper inducements to his confession by in essence stating that first degree murder charges would not be filed if Johnson confessed.

The following day, Saturday, an additional interview was scheduled between Dr. Lindauer and Johnson, at the request of Johnson. By this time Dr. Lindauer was rather firmly convinced that Johnson was guilty of the homicide. He gave defendant a hypothetical scenario of how the homicide might have occurred, as follows: "It boiled down to probably his [Johnson's] going up to smoke pot with a neighbor and his wife locking him out [of their apartment] because he was stoned and then his climbing through the window and his wife was in bed but perhaps not asleep, and, if she or when she threatened to leave him, partly because she was a tease, he struck her with what was at hand, because he was scared and angry and what was at hand was apparently the bar stool."

The stabbing occurred afterward.

Also on Saturday, Johnson and Dr. Lindauer, at Johnson's instigation, went back to the apartment area to look under rocks to see if the two of them could find the knife used in the stabbing. They were unsuccessful.

On Monday, June 21, 1971, Johnson telephoned Dr. Lindauer to describe the dream he had had the preceding night. Dr. Lindauer de-

scribed that conversation in the record and stated: "He [Johnson] then said that he was going to contact Mr. Oxandaboure that morning to tell him that he feels guilty, but that honestly he could not recall the event and he said he wanted to find out the truth about himself, and then he said that he would ask for hypnosis or a pentothal interview that very day, and I corrected it to amytal interview, I recall telling him that."

Dr. Lindauer later in the conversation suggested, as he had several times in the past, that Johnson obtain an attorney. Johnson, as he had done in the past, declined to seek an attorney's advice because he claimed the situation was "urgent." Johnson then stated, "It apparently looks like I did it, but I can't recall it. I feel guilty."

A videotaped sodium amytal interview, given by a Dr. Hunter, occurred that very day.[1] For the first time, Johnson made statements which could definitely be considered incriminating. At the beginning of the amytal interview, Johnson claimed he was unable to recall many of the events of the crucial night. With respect to the events that he did recall, Johnson was unsure whether his recollections were memories or visions, but he was inclined to think they were visions. As the interview continued, however, his memory became, by a slow process, somewhat clearer. He stated, for instance, "I grabbed the stool. I think I was going to hit her, but I don't remember." Later in the interview, he stated, "I think I did hit her—but I didn't mean to hit her." Still later, Johnson said, "I hit her and it didn't register that it hurt." Finally, much later in the interview, Johnson said, "I believe I killed my wife when I hit her with the foot [sic] stool, I don't believe I stabbed her." Throughout the interview, Johnson was unable to remember incidents involving the stab attack. Johnson did remember, however, he was covered with blood at one point, and that it was necessary for him to take a shower.

After the sodium amytal interview was completed, Johnson was placed under arrest for the first time and kept in custody in the San Clemente jail.

The next day, June 22, 1971, interrogation of Johnson continued. Johnson was read his rights, and then made statements which tended to incriminate him. He, for instance, admitted to remembering he had the bar stool in his hand on the fatal night. He also remembered a shower was necessitated that night because he was covered with blood. Further, Johnson indicated at the interrogation that he thought he remembered throwing his wife's wallet off a pier after the homicide had occurred. He

---

[1]The court has viewed and heard the videotape. Quotations taken therefrom, which are set out below, represent the court's own transcription.

also indicated he remembered shoving a knife underneath a rock on that evening.

Johnson challenges the voluntariness of the police interviews of June 22, 1971, as related above. He asserts that, at the time of these interviews, he was still under the influence of the truth serum sodium amytal, and he was consequently unable to intelligently consider and waive his *Miranda* rights. Moreover, he asserts the June 22d interrogation suffers from the same defects of the previous day's sodium amytal interview, in that whatever confessions or admissions he made were inherently unreliable and involuntary.

On the basis of the record before him, the trial judge ruled that statements made by the defendant during the nine-day period of interrogation were voluntarily made. He found, at all material times, defendant Johnson had been advised of his rights pursuant to the *Miranda* case. He additionally found nothing prohibited by law was used to induce or coerce statements by the defendant, and the defendant was not under the influence of sodium amytal to the point it affected his ability to make free decisions about whether to answer questions put to him by his interrogators. The trial court thus concluded, on a reasonable doubt standard, that statements made by the defendant were both voluntary and admissible.

In challenging his conviction, defendant Johnson asserts the "totality of circumstances" requires this court to find his statements were involuntarily made, being psychologically coerced by the authorities. He alleges initially he was not advised, at all relevant times, as to his rights pursuant to the *Miranda* decision. He additionally claims whatever confessions or admissions he may have made were improperly induced by prosecutorial promises of leniency in the event he did confess. Finally, defendant Johnson alleges truth serum interviews per se are inadmissible because they are scientifically unreliable. This allegation goes directly to the sodium amytal interview of June 21, 1971 and also to statements made by him the following day, when he maintains he was still under the influence of the sodium amytal.

I

Defendant Johnson alleges he was improperly and inadequately advised of his constitutional rights during a period of what he characterizes as continuous interrogation from June 14, 1971, to June 22, 1971. Defendant first maintains he has a constitutional right to receive a readvisement of his *Miranda* rights prior to each separate episode of interrogation. He claims he did not receive such readvisement and therefore any confessions made by him should be ruled inadmissible. Defendant secondly urges he was given a series of conflicting warnings as to his *Miranda* rights and such con-

flicting warnings negate the effect of any warning properly given. Thirdly, defendant asserts the police had a duty to maintain written records of their advisements of rights to the defendant and of his waivers thereof, and he specifically criticizes the failure of the videotape (of the June 21, 1971 sodium amytal interview) to include a *Miranda* advisement and the failure of the tape recording of the June 22, 1971 interrogations to be prefaced by *Miranda* advisements. Last, defendant asserts that he could not properly have been advised of his rights per *Miranda* because, at the time of the interrogation, he was "an inexperienced youth."

■ Unless preceded by an adequate warning of constitutional rights and a voluntary and knowing waiver thereof, a confession is inadmissible if made during the course of a police investigation which is focused on a particular individual, who is then in police custody. Specifically, a suspect individual must be informed of his constitutional rights to the presence of an attorney, and, if he is indigent, that an attorney will be appointed for him. Such a person must also be informed that he has an absolute right to remain silent. (*Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]; *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].)

■ Defendant initially asserts a contemporaneous warning is required under *Miranda* at the outset of each interrogation, citing *People* v. *Matthews,* 264 Cal.App.2d 557 [70 Cal.Rptr. 756]. Since the record does not reflect the defendant was warned prior to each separate episode of interrogation, he asserts that much of the evidence admitted at trial was improperly admitted.

■ The law does not require that a defendant be readvised of his rights prior to each separate interrogation. (*People* v. *Brockman,* 2 Cal. App.3d 1002, 1006 [83 Cal.Rptr. 70]; *People* v. *Long,* 263 Cal.App.2d 540, 545 [69 Cal.Rptr. 698]; *People* v. *Sievers,* 255 Cal.App.2d 34, 37-38 [62 Cal.Rptr. 841]; *People* v. *Perrin,* 247 Cal.App.2d 838 [55 Cal.Rptr. 847].) Subsequent interrogations without *Miranda* warnings are insulated from successful constitutional attack upon a judicial finding of fact that a prior adequate *Miranda* warning was given within a reasonably contemporaneous period of time. (See *People* v. *Johnson,* 70 Cal.2d 469, 477 [74 Cal.Rptr. 889, 450 P.2d 265].) The case of *People* v. *Matthews, supra,* 264 Cal.App.2d 557, on which defendant relies heavily, does not contradict the above law since *Matthews* involved a situation wherein the prior *Miranda* warnings were deficient in coverage.

■ In the instant case, there is more than adequate evidence that defendant Johnson was advised of his rights on numerous occasions. There

is, in addition, evidence that, on June 10, 1971, when Oxandaboure first met the defendant, he read *Miranda* rights to the defendant verbatim from a card. There is additional clear evidence that prior to the first psychiatric interview *Miranda* rights were again read to the defendant from a card. At various other points later on in the interrogation, there are other instances where defendant was again formally read his rights verbatim from a card.

Defendant's next allegation in connection with *Miranda* warnings is that he was given conflicting versions of his *Miranda* rights. He cites *People v. Johnson, supra,* 70 Cal.2d 469, 477 for the proposition that "[a] series of conflicting warnings might well negate the effect of warnings that were properly given." Conceding the truth in this statement, it is difficult to ascertain the defendant's precise objection, since this court has not discovered any instance of a misleading advisement.

Defendant also objects to the failure of the prosecution to produce *written or recorded* evidence that the defendant waived his *Miranda* rights. Specifically, the defendant refers to the videotape made under sodium amytal, and notes the videotape is not preceded by a recorded advisement of rights. Since, as noted above, the state was under no obligation to continually readvise the defendant of his rights per *Miranda,* the fact that, in any particular instance, there is no written or recorded advisement and waiver of rights is not fatal. ■ Indeed, and more basically, it has been explicitly recognized in this jurisdiction there is no requirement whatsoever that *Miranda* warnings and waivers be recorded or written. (*People v. Baxter,* 7 Cal.App.3d 579 [86 Cal.Rptr. 812].)

Defendant's final allegation is that whatever *Miranda* warnings were given were inadequate in view of his youth and inexperience. Defendant offers no citations of authority for this proposition. Moreover, the record simply does not support any contention that Johnson, a Marine, was inexperienced in the ways of life.

■ In sum, then, this court finds substantial evidence supports the trial court's conclusion that Johnson was fully and adequately advised of his constitutional rights at all material times.

## II

■ Johnson next contends that he was coerced into making a confession by a prosecutorial promise of leniency. He asserts Oxandaboure told him if he didn't speak to the officers and tell them of mitigating circumstances, these officers would file a first degree murder complaint against him. Respondent, in contrast, denies any allegation of impropriety and

asserts any confession or admission made by Johnson was voluntarily made.

 A confession is voluntary unless it is the product of a rational intellect and a free will. (*Davis* v. *North Carolina,* 384 U.S. 737, 739 [16 L.Ed.2d 895, 897, 86 S.Ct. 1761].) If an accused's will to resist confessing is overborne, any resultant confession is per se not the product of a rational intellect and a free will. (*People* v. *Ketchel,* 59 Cal.2d 503, 520-521 [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Lopez,* 60 Cal.2d 223, 248 [32 Cal.Rptr. 424, 384 P.2d 16].) In inquiring into the voluntariness of a defendant's confessions or admissions, a court must examine the "totality of circumstances" surrounding the state's conduct. Factors such as the length of questioning, the nature of the questions, and the conduct of the authorities are all relevant in determining whether the accused's free will was overborne. (*People* v. *Stewart,* 62 Cal.2d 571, 579 [43 Cal.Rptr. 201, 400 P.2d 97].)

 On appellate review, where there is conflicting evidence as to the voluntariness of a confession, the trial court's determination will not be disturbed unless it is "palpably erroneous." (*People* v. *Robinson,* 274 Cal. App.2d 514, 520 [79 Cal.Rptr. 213]; *People* v. *Stafford,* 240 Cal.App.2d 422, 424 [49 Cal.Rptr. 598].) Taking a broad view in the instant case, it appears Johnson's will was not overborne, and his prime motivation *in submitting to interrogation* was a self-driven desire that the "truth will out." This motivational conclusion is buttressed by the fact Johnson was aware at all times and was consistently told he need not engage in any of the interviews with law enforcement officers or in any of the sessions with the psychiatrist. In this situation, the trial court was entitled to give great weight to the fact Johnson took the initiative, at times, in scheduling interviews with Dr. Lindauer and to the fact Johnson was the one who suggested a truth serum interview would be appropriate.

On the more limited question of an improper prosecutorial promise of leniency, defendant Johnson particularly objects to certain statements allegedly made by Oxandaboure on Friday, June 18, 1971, while defendant was in Dr. Lindauer's office. There is ample evidence in the record to sustain a conclusion Oxandaboure was called to the office by Dr. Lindauer at the instigation of Johnson, who was very much interested in the penalty options he would face were he charged with the homicide. Mr. Oxandaboure testified as follows as to the contents of that interview: "I told or advised Mark Johnson of his rights again and I also told Mark Johnson that we had reached the case [*sic*] to the point where we were going to make a decision as to what we were going to do in the case, but in order

to properly evaluate the case we would like to hear from him, and from his lips only as to how he killed his wife."

When this statement is viewed in the context of Oxandaboure's other statements of that day, however, it becomes apparent Oxandaboure neither made nor implied any promise on the part of the Orange County prosecuting agency not to charge first degree murder in the event Johnson admitted to facts more compatible with lesser charges of homicide.

Defendant Johnson also asserts Dr. Lindauer said, on August 3, 1971, that Oxandaboure told Johnson, on June 18, 1971: "Look Mark, I either file a first degree murder conviction [*sic*] on you a la *Hicks,* or I try to find some way to get the goods on you which, ironically enough, if I do get the goods on you will reduce the penalty."

This statement, which was tape recorded, was presented in impeachment of Dr. Lindauer's testimony on the stand. Despite the above, when testifying, Dr. Lindauer stated Oxandaboure had said to Johnson he would file a murder charge against Johnson with or without a confession. The thrust of Dr. Lindauer's testimony, thus, tends to refute defendant's charge there was a promise of leniency on the part of Oxandaboure.

In sum, there is substantial evidence in the record to support the trial judge's conclusion that, beyond a reasonable doubt, no improper inducement was utilized to gain Johnson's cooperation in the interrogative process. Consequently, with the exception of certain interviews conducted while defendant Johnson was under the influence of truth drugs (to be discussed, *infra*), all self-incriminating statements made by him meet the requisite standard of voluntariness.

### III

▮▮▮ Defendant Johnson finally alleges that truth serum interviews are inadmissible because they are scientifically unreliable. He points to Evidence Code sections 350 and 351, which provide for the admissibility of only "relevant evidence."

Defendant's objection to evidence gathered while he was under the influence of sodium amytal extends to the original amytal interview on June 21, 1971, and also to police interviews occurring the next day. Uncontradicted expert evidence exists to the effect that defendant would still have been under the influence of amytal on June 22, 1971, at the times when he was reinterviewed by Oxandaboure and others.

Over defendant's objection, the trial judge admitted the June 21, 1971, videotape of the sodium amytal interview on the theory that, though it

was hearsay, it was a voluntary statement within the admissions exception. The trial judge made this ruling without taking foundational evidence as to the reliability of such an interview technique. In fact, the interviewer, Dr. Hunter, was not even called to the stand; consequently, the record contains no indication of his qualifications.

The defendant presented the only expert testimony in the record on the question of sodium amytal interviews. Drs. Wilson and Elliott both stated sodium amytal takes away anxieties, interferes with the ability to think rationally and clearly, reduces a person's defenses, and makes one extremely suggestible and unable to comprehend the seriousness of the situation. Both doctors also testified that sodium amytal is not a universal truth drug, and that it is quite possible for a person to lie under the influence of sodium amytal. They further stated a subject's truthfulness under the influence of sodium amytal is an "all or nothing" thing and that *any* evidence of untruthfulness would make the entire sodium amytal interview unreliable.

In the instant case, there is unequivocal evidence Johnson did not consistently tell the truth during the amytal interview of June 21, 1971. On that occasion, defendant Johnson stated he spent a portion of the night prior to the homicide upstairs with Jack, a neighbor, smoking pot. Since there is a stipulation in the record that Jack was not home on the night in question, the above statement of defendant Johnson is necessarily false.

Both Drs. Wilson and Elliott, when they learned of this "lie" with respect to Jack's presence on the night of June 15-16, 1970, stated the entire contents of the sodium amytal interview would be untrustworthy. Each doctor emphasized the extreme suggestibility of a person under the influence of sodium amytal, and Dr. Wilson even suggested that Johnson's knowledge of the impending charge would lead possibly to his giving a false confession.

The only witness asserting the reliability of the sodium amytal interview of June 21, 1971, was Dr. Lindauer. Under examination, Dr. Lindauer admitted he had personally never conducted a sodium amytal interview. He also testified that, though he had viewed sodium amytal interviews in the past, the last such occasion had been in 1963. Overall, thus, the record is clear that Dr. Lindauer cannot reasonably be considered an expert in truth serum interviews.

To this date, neither the Supreme Court nor any appellate court of this state has admitted into evidence polygraph or truth serum tests *for the truth of the matter stated*. The rationale for refusing admissibility of such tests is that there has been a lack of scientific certainty about the results. (*People* v. *Jones*, 52 Cal.2d 636, 653 [343 P.2d 577].)

In this case, the People did not even attempt, by expert witnesses, to prove the reliability of sodium amytal tests. In such a situation, and in the face of the defendant's experts' testimony, it was clearly error for the truth serum interviews to have been admitted. Since defendant's experts also testified Johnson was under the influence of sodium amytal on June 22, 1971, the day after the initial sodium amytal interview, it was likewise error to have admitted drug-influenced statements made to Oxandaboure on that day.

The error in admitting Johnson's statements of June 21 and June 22, 1971, assumes constitutional dimensions since, on both days, the defendant essentially confessed to the homicide. While Johnson may indeed have voluntarily taken sodium amytal, this fact is insufficient to justify a conclusion that, during the *course* of his "drug-influenced" statements, his will was not overborne by the drug. In fact, given the uncontradicted expert testimony that sodium amytal interferes with the ability to think rationally and clearly and makes one extremely suggestible, it appears the trial judge abused his discretion in finding the instant drug-influenced statements voluntary and admissible.

The use of confessions obtained while a criminal defendant is in such an artificially suggestive state that his free will is overborne amounts to a denial of due process under both the federal and state Constitutions. Reversal of a conviction is required, in such a circumstance, even if other evidence is consistent with guilt. (*Blackburn* v. *Alabama,* 361 U.S. 199 [4 L.Ed.2d 242, 80 S.Ct. 274]; *People* v. *Matteson,* 61 Cal.2d 466, 470 [39 Cal.Rptr. 1, 393 P.2d 161]; *People* v. *Trout,* 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418].) The fact that the instant case involved a trial by the court, as opposed to a trial by jury, is not decisive. (*People* v. *Berve,* 51 Cal.2d 286 [332 P.2d 97].)

The judgment is reversed.

Kaufman, J., concurred.

**GARDNER, P. J.**—I dissent.

The majority has seen fit to reverse an otherwise error-free murder conviction simply because a trial judge, with vision and intestinal fortitude, faced with the lonely responsibility of determining guilt or innocence, saw fit to avail himself of a truth-finding technique which has not as yet received the formal stamp of approval from the courts of this state. With this decision I cannot agree.

This case represents a classic reflection of an attitude of the courts toward the rules of evidence which I find to be completely out of step with the facts of life as they exist today.

Too much of the law of evidence has its roots in an era when jurors were ignorant peasants and an elite group (the lawyers and judges) carefully hand fed them such information as they (the elite) felt the peasants could safely absorb.[1] At the beginning of the Nineteenth Century, De Tocqueville observed that lawyers had become, in their eyes at least, a sort of intellectual aristocracy in American society. At the risk of ruffling the feathers of other members of my chosen profession, I would point out that that happy social arrangement no longer exists. It is now the latter portion of the Twentieth Century and while many, and perhaps most, lawyers and judges still consider themselves an elite corps, any substantial experience on the trial court level should persuade all but the most barnacle-encrusted traditionalist that the average juror today enjoys a knowledge, an awareness, a sophistication and in many cases an education comparable to or superior to that of law school graduates. It is high time that lawyers and judges accept the fact that the rest of society is entitled to the respect and consideration of equals. The mere possession of an LL.B. or J.D. does not anoint the holder with powers of discernment not vested in ordinary mortals. Today it takes a certain effrontery, a certain intellectual arrogance, a certain intellectual snobbery, to say to a juror, "You cannot hear this evidence because you are not capable of effectively evaluating it." Because of a lack of appreciation of the stability and integrity of the jury system, too much emphasis is still being put on the danger of prejudicing the jury by the admission of allegedly improper evidence.[2] Basically, everything helpful to the truth-finding process should be admissible as relevant evidence with this limitation, that the trial court

[1] I recognize that this was a nonjury trial. However, our rules of evidence are basically built around the jury system and I shall discuss this matter as though it had been a jury trial. There is probably some way to weasel out a nonprejudicial error concept in this case because the case was tried by a court and not by a jury. However, I do not choose to avail myself of such an opportunity. Knowing Judge Murray, I am sure he would have made the same ruling on admissibility of this evidence had this case been tried before a jury. I would have—and have. When on the trial bench, I admitted a video tape of an interview with a defendant under hypnosis. Unhappily, even though there was a conviction and an appeal, this issue was not presented on appeal since the defendant presented the evidence.

[2] That same fear of prejudicing the jury is the basis for some of the rather unrealistic rules now being promulgated in the field of prejudicial pretrial publicity. This is not the time or place to become embroiled in the continuing free press-fair trial controversy. I will, for the moment at least, let the press carry on their side of this battle. I merely suggest that a true appreciation of the modern day jury would make clear that many of the current rules in this field are completely unnecessary.

be afforded a great deal more discretion than it presently enjoys in conducting proceedings in such a way that unnecessarily time consuming and nonproductive evidence be excluded. Thus, the trial court should, in the exercise of its discretion, deny admission to that evidence the probative value of which is outweighed by undue consumption of court time.

Turning to the case at bench, the majority states "to this date, neither the Supreme Court nor any appellate court of this state has admitted into evidence polygraph or truth serum tests *for the truth of the matters stated.* The rationale for refusing admissibility of such tests is that there has been a lack of scientific certainty about the results." (*People* v. *Jones,* 52 Cal.2d 636, 653 [343 P.2d 577].)

*Jones* is an interesting case.

In *Jones,* the defendant offered to repeat his testimony under the influence of truth serum. The court held that counsel had not made a proper offer of proof and made the following holding: "Therefore, even if the results of such a test were admissible, no error was here committed in the absence of a proper offer of proof. [Citation.]"

After this holding the court made the following broad statement: "Moreover, the result of such a test is not admissible in a criminal case. The courts have consistently held that whether the test is a polygraph test, or a sodium amytal or sodium pentothal test, the results are not such as to be admissible for or against the defendant because of a lack of scientific certainty about the results. (*People* v. *Aragon,* 154 Cal.App.2d 646, 658 . . . ; *People* v. *Wochnick,* 98 Cal.App.2d 124, 127 . . . ; *People* v. *Carter,* 48 Cal.2d 737, 752 . . . ; *People* v. *Parrella,* 158 Cal.App.2d 140, 147 . . . ; *People* v. *Porter,* 99 Cal.App.2d 506, 510 . . . ; *People* v. *McNichol,* 100 Cal.App.2d 554, 558 . . . ; *People* v. *Cullen,* 37 Cal. 2d 614, 626 . . . ; Witkin, California Evidence, pp. 371-373, §§ 332-335; 39 Cal.L.Rev. 439; 6 Stan.L.Rev. 172; 42 Cal.L.Rev. 880, 69 Harv. L.Rev. 683; 23 A.L.R.2d 1310.) These tests do not scientifically prove the truth or falsity of the answers given during such tests. [Citation.]" (*People* v. *Jones, supra,* 52 Cal.2d 636, 653.)

I submit that the above statement qualifies as dictum, the *holding* having been that there had not been a proper offer of proof. While the *stare decisis* doctrine requires us to follow the holdings of the Supreme Court, this doctrine does not apply to dictum. We are to accord dictum the weight to which it is entitled as the expression of a majority of the Supreme Court; however, it is not binding on this court. (*People* v. *Gregg,* 5 Cal.App.3d 502 [85 Cal.Rptr. 273].)

*Wochnick, Aragon, Carter, Parrella* and *Porter,* cited in *Jones,* are clear holdings that polygraph evidence is inadmissible.[3]

However, the same cannot be said of drug-influenced evidence. I submit that the Supreme Court has made no such firm ruling in this field.

In *McNichol,* the defendant, who claimed to have been drinking to the extent that he had no recollection of passing certain fictitious checks on which his conviction was based, attempted to introduce into evidence statements he made while under the influence of sodium pentothal. The offer was made on three grounds with the following rulings: (1) Past recollections recorded. The court declared that this was an improper ground since the defendant had no recollections to record. (2) To show the facts upon which the psychiatrist based his opinion (that the defendant had been drinking and had no intent to defraud). The court held that a showing of the facts themselves was not a necessary part of the psychiatrist's opinion. (3) To be allowed as a matter of defense although otherwise inadmissible. In this respect the court held that the statements would be hearsay and self-serving declarations. Thus, *McNichol* hardly stands for a blanket repudiation of the use of drug-influenced testimony.

In *Cullen,* the defendant asked the court to appoint a psychiatrist to examine him under the influence of sodium pentothal and offered proof as to the reliability of the result. The court held "[i]t is *questionable* whether the results of such an examination would be admissible in evidence [citing *McNichol*]. And the offer of proof indicated that the statements to be produced would be hearsay, self-serving and conjectural since the truth thereof would depend entirely on the psychiatrist's opinion which conceivably might conflict with the opinion of another psychiatrist." (Italics supplied.)

Thus, it would appear that the two authorities cited in the blanket statement of disapproval of drug influenced testimony by the court in *Jones* hardly afford support for that statement.

In another *People* v. *Jones,* 42 Cal.2d 219 [266 P.2d 38], the court held it to be error to deny admission of the testimony of a psychiatrist

---

[3]While the excuse for judicial activism as opposed to judicial restraint has been that when the Legislature fails to act, a vacuum exists, and the courts must step in, strangely enough in the field of polygraph testing the reverse is apparently about to take place. The judicial attitude toward the polygraph test was stated quite clearly by Senator Ervin recently in the Watergate hearings when he referred to the polygraph as "Twentieth Century witchcraft." Yet, as this is being written, the Legislature is apparently in the process of acting in the field. Senate Bill 119 permitting limited admissibility of polygraph testing results has passed the Senate and is now pending in the Assembly.

that a person charged with Penal Code section 288a, was not a sexual psychopath which opinion was based on a so-called truth serum interview. The court said at page 225, "[a]lthough, as the attorney general properly points out, it is *questionable* whether the results of examinations made while a person is subject to the 'truth drugs' are admissible in evidence [citing *McCracken,* below, and *Cullen,* above] that conclusion is correct only if the statements are offered for the purpose of proving the truth of the matter asserted [citing *McCracken* and *Cullen* to the effect that the evidence would be self-serving hearsay]." (Italics supplied.)

In *People* v. *McCracken,* 39 Cal.2d 336 [246 P.2d 913], the defendant complained of the trial court's refusal to permit that he be subjected to "truth drugs" while on the witness stand. The court held "[i]t is *questionable* [that word again] whether the results of such examination would have been admissible in evidence [citing *Cullen*]. But even if they were admissible, the procedure would be discretionary with the trial court, and it cannot be said that the court abused its discretion." (Italics supplied.)

In *People* v. *Cartier,* 51 Cal.2d 590 [335 P.2d 114], the court held it was error to deny admission to the opinion of a doctor as to the defendant's sanity when an examination had been made while the defendant was under the influence of sodium pentothal.

Thus, I find that it is abundantly clear that while the Supreme Court has stated that the admission of drug-influenced evidence is *questionable,* there has as yet been no clear cut adjudication of the admissibility of this type of evidence. In *Jones* [52 Cal.2d 636], the picture was blurred by reason of the failure of counsel to establish the proper foundation. In *McNichol* and *Cullen,* a basis for the rejection of the testimony was that it would be hearsay and self-serving. (In the instant case, the latter objection is not valid since the statements are being received as admissions and, therefore, constitute an exception to the hearsay rule.) In *Jones* [42 Cal.2d 219] and *McCracken,* the court merely observed that the admission of such evidence was questionable. Thus, all the Supreme Court has said is that it is *questionable* that the *results* of such an examination are admissible. In other words, while we are not writing on a completely clean slate, we are not, I submit, bound by a direct holding of the Supreme Court that such evidence is inadmissible. I would prefer to allow the admission of this evidence in this case. In view of the present state of the law, I feel no compulsion for supine acquiescence to the dictum of the 52 Cal.2d *Jones.*

The objection of the majority to the admission of this evidence is twofold:

(1) That the evidence was admitted for the truth of the matters stated therein.

Strangely enough we allow a psychiatrist, a member of that most inexact of the sciences, to testify that from the results of such a test a defendant does not have a certain state of mind essential to the crime (the 42 Cal.2d *Jones*) yet deny the trier of fact the opportunity to actually see and hear the evidence upon which the psychiatrist comes to this rather extraordinary conclusion. Basically, the objection to polygraph, drug-influenced, or hypnotically induced evidence is based on the fact that the polygraph operator, the psychiatrist or the hypnotist is attempting to substitute his opinion for that of the jury as to the truth or falsity of the witness' testimony. I will concede the validity of this concept but for the life of me I cannot find any validity to a ruling by which the trier of fact may not be exposed to a video tape of what the witness actually stated when that video tape is offered for the truth of the matters contained therein when, as in this case, the basic hearsay problem does not exist. Had I my "druthers," I would "druther" allow the trier of fact to evaluate the video tape testimony itself—for the truth of the matters stated therein—than accept the conclusion of the expert as to the results of this examination.

(2) There was no evidence of the reliability of such tests.

In this holding the majority violates the basic rule of appellate review and accepts the testimony of the defense experts and entirely ignores the testimony of Dr. Lindauer who testified as to the effect of sodium amytal. Dr. Lindauer testified that it has a tendency in some people to break down certain repressive inhibiting functions of the subconscious mind and under its influence some people are more inclined to tell the truth than without the benefit of the drug. However, it was made clear that in some cases this result does not occur. It all depends on the individual. With this as a background, I would have no hesitancy in admitting the evidence. I cannot agree with the statement of the majority that Dr. Lindauer "cannot reasonably be considered an expert in truth serum interviews." I liked his testimony. He has not tried to oversell his product. The majority apparently desires an expert to say that a witness under sodium amytal *will* tell the truth. That kind of expert, I don't want.

I think I should attempt to make clear that I am distinguishing the instant situation from one in which it *is* necessary that there be proof not only that tests are scientifically reliable but that the technique has received general acceptance in the scientific community. I authored an opinion recently (*Hodo* v. *Superior Court*, 30 Cal.App.3d 778 [106 Cal. Rptr. 547]) in which the results of spectographic analysis of the human

voice—voiceprints—were held to be admissible. I will not attempt to repeat that overlong analysis of the applicable law as set forth in that case to this already seemingly interminable dissent. I would merely suggest that we are dealing with an entirely different situation in the instant case. Had Dr. Lindauer testified that, in his opinion, the defendant was telling the truth during his interview the good doctor would not only be usurping the function of the jury but the record would be sadly lacking in substantial evidence of the scientific reliability of the technique or its acceptance in the scientific community. However, the doctor merely testified as to the probable or perhaps possible results of the use of sodium amytal that, in layman's language, it dulled the inhibitory nerve. The trier of fact by seeing and hearing the video tape was able to draw its own conclusion as to the ultimate fact, i.e., the truth or falsity of the statement made. This is a far cry from a situation such as that in the above mentioned voiceprint case where, without interpretation by the expert, the spectograph would be nothing but a meaningless jumble to the jury.

Here, there was a lengthy, painstaking, meticulous and fair investigation by the authorities. At one stage, Officer Oxandaboure told the defendant, "We don't want a false confession." The defendant himself wanted help in finding the truth. He said, "He wanted to find out the truth about himself and then he said that he would ask for hypnosis or a pentothal interview that very day." At the interview not only voluntarily taken but sought by the defendant, his memory became clearer until he finally remembered what happened on the night of the crime. The trial court found that the statements were voluntarily made and the defendant was not under the influence of sodium amytal to the point that it affected his ability to make free decisions about whether to answer questions put to him by the interrogator. The court concluded, based on a reasonable doubt standard, that the statements were voluntary. That finding is supported by substantial evidence. Unhappily, the majority has seen fit to usurp the function of the trial judge in now finding that the trial judge abused his discretion in finding that the drug-influenced statements were voluntary and admissible.

A final statement of the majority is that the use of a confession obtained while a criminal defendant is in such an artificially suggestive state that his free will is overborne amounts to a denial of due process. This is true—if the evidence is that the defendant's free will is overborne. However, this holding, if that is what it is, runs contrary to the ruling of the trial judge, supported by substantial evidence that the defendant's free will was not overborne. I would merely observe that there is a ple-

thora of authority to the effect that admissions or confessions are not necessarily involuntary because the defendant is under the influence of alcohol or drugs (see *People* v. *Massie,* 66 Cal.2d 899 [59 Cal.Rptr. 733, 428 P.2d 869]; *People* v. *Matteson,* 61 Cal.2d 466 [39 Cal.Rptr. 1, 393 P.2d 161]; *People* v. *Trout,* 54 Cal.2d 576 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]; *People* v. *Wright,* 273 Cal.App.2d 325 [78 Cal.Rptr. 75]; *People* v. *Dacy,* 5 Cal.App.3d 216 [85 Cal.Rptr. 57]; *People* v. *McPherson,* 2 Cal.3d 109 [84 Cal.Rptr. 129, 465 P.2d 17]; *People* v. *Lyons,* 18 Cal.App.3d 760 [96 Cal.Rptr. 76]), and I fail to find a valid distinction between a statement made when a defendant has self-ingested alcohol or drugs and a statement by a defendant who has requested the use of drugs for the purpose of ascertaining the truth and a prosecution witness administers the drug.

Putting a judicial stamp of disapproval on *all* drug-influenced testimony contributes little to the judicial process. I would prefer to leave more discretion in the trial court. If the process tends to become a circus, he can cut it off.

In the instant case, I would not reverse simply because a trial judge availed himself of a somewhat novel tool in his effort to ascertain the truth. While this court, as a court of intermediate jurisdiction, can do little to change some of the hoary and outmoded rules of evidence, we should, when a trial judge with vision and courage attempts to open new vistas in the ever-continuing search for the truth, support that effort.

I would affirm the judgment.

A petition for a rehearing was denied July 16, 1973. Gardner, P. J., was of the opinion that the petition should be granted. The petitions of the appellant and the respondent for a hearing by the Supreme Court were denied August 16, 1973.