[Crim. No. 16007.   Second Dist., Div. Four.   July 1, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT
EUGENE ROBINSON, Defendant and Appellant.

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Frederick R. Millar, Jr., Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J.—Defendant was convicted of first degree murder in a nonjury trial and was given a prison sentence. He appeals from the judgment contending that he did not voluntarily and intelligently waive his constitutional rights to silence and counsel before his confession to the police.

On January 18, 1968, at about 7:40 p.m., taxicab driver Alonzo Hancock was found dead by Compton police officers. He was slumped behind the steering wheel of his cab with a gunshot wound in the head. The vehicle was parked on a street in Compton at the location where it had been sent shortly before by the dispatcher in response to a phone order. A few moments before the officers arrived, a passerby observed the parked taxicab. There were three young men in or about the vehicle with the driver. The passerby then heard what sounded like a firecracker and saw the three young men run off.

The murder weapon was a .38 caliber revolver (People's Exhibit 4). Earlier the same day (at about 4 or 5 p.m.) Louis Powell, Jr., took the gun, which he had obtained from the locked glove compartment of his father's car, to the house of Thomas Brown. Defendant was present along with Brown, Dennis Thompson, Steve Thompson, Billy Ford and Donald Wright. They went into the garage and began a discussion about using the gun to commit a holdup. As they were talking, defendant handled the gun and swung out the cylinder to examine the bullets inside. They decided to rob the driver of the Helms Bakery truck when it stopped near the Laurel Street school in Compton. They went over to that location at about 5 o'clock but the truck did not arrive.

Defendant, Wright and Brown then left Powell and the others. Wright, who had the gun when they left, said they were going to Los Angeles. Powell heard them mention earlier that, after they pulled the Helms' job, they were going to Los Angeles to pull another job. Powell did not see them again until the next day. When he encountered defendant walking towards Wright's house that morning, he asked, "Did you get the money?" Defendant replied, "No. We got into a little trouble. We killed a taxicab driver."

Defendant was arrested at a Compton residence at 6:35 p.m. on Saturday, January 20. With him at the time and also arrested was Wright and another young man (the latter being arrested for possession of narcotics after "pills" [seconal] were found on his person).

Officer Friske, one of the arresting officers, told defendant at the time he was taken into custody that he was under arrest for murder. Officer Waugh, another of the arresting officers, then advised defendant of his constitutional rights (in compliance with *Miranda* requirements) and asked him if he understood each of these rights. Defendant stated that he did. Defendant was then asked if he wished to discuss the case. He answered affirmatively. He was not, however, questioned at that time but was placed in the police car of Officer Waugh and his partner Officer Edwards and was driven to the police station.

Upon their arrival there, at 7:20 p.m., he was taken to an interview room by Officer Waugh. After filling out an investigator's report, Waugh again advised defendant of his constitutional rights and again asked him if he understood the rights. Defendant again said "yes." After asking defendant a few questions, Waugh was summoned elsewhere and Officer

Edwards, who had entered the interview room when Waugh had completed the investigator's report, took over the interview.

Edwards first readvised defendant of his rights and had defendant repeat what he understood them to be. Defendant told him that he had the right to remain silent; that anything he said could be used against him in court; that he had the right to have an attorney present; and that if he could not afford one he could have a public defender. Edwards further explained to defendant that, "that meant he didn't have to talk to me unless he desired to talk to me."; that it also meant he was entitled to have an attorney or public defender during the interview if he wished. Defendant said he understood this and that he wanted to talk. Edwards then began to question defendant and to write out his statement. Before the statement was completed, however, Officer Waugh returned to the interview room and informed Edwards that he had learned that defendant was still a juvenile. Edwards had not been aware of this fact. The interview was then terminated and defendant was taken by Edwards to Lieutenant Correa, the commander of the Juvenile Division. Edwards filled Correa in on the situation.

Lieutenant Correa had seen defendant 20 or 30 times prior to this time and knew him well. Several of these contacts concerned violations of the law, some minor but others more serious. Correa recalled that, on November 11, 1966, he had personally advised defendant of his constitutional rights (using the *Miranda* format) and that defendant had on that occasion invoked his right to remain silent. On two other past occasions Correa recalled that defendant had been advised of his rights and had elected to waive them and talk to the investigating officers.

After conversing with Officer Edwards, Lieutenant Correa began a conversation with defendant. It was about 9 p.m. The conversation was preceded by another admonition as to his rights. Rather than reading the rights from a card, Correa testified, "I broke down the specific rights into a language that I know Bob [defendant] could understand." After each right was explained to defendant, he was asked if he understood, and defendant each time replied "yes." Correa then asked defendant if he desired to continue with the interview and defendant said "yes." Correa asked defendant if he had any objection to having the conversation tape recorded and defendant replied "no." At this time Correa's presence was

required elsewhere in the building and he told defendant that Edwards would continue with the interview. Defendant stated "It's all right with me, Mr. Correa."

Defendant then gave a detailed tape-recorded statement (People's Exhibit 1) to Officer Edwards relating his involvement in the shooting of the cab driver. He stated that he had entered the taxi with Brown and Wright for the purpose of robbing the driver; that during the holdup Wright shot the driver. Defendant further stated that he was making the statement freely and voluntarily, and that no promises had been made to him to induce him to make it. He was asked if he had been advised of his rights and he said "yes." He recited what his rights were at the officer's request. In response to additional questioning, defendant stated that he did not desire to have an attorney present during the interview.

Defendant's parents were contacted when he was arrested. His mother, however, did not arrive until shortly after the interview was taped. Defendant never asked for his parents or even mentioned them.

Lieutenant Correa and Officer Waugh both testified that defendant did not appear to be under the influence of drugs or alcohol on the evening of his arrest. Because he had information that some dangerous drugs were found when defendant was arrested, Correa closely observed defendant, paying particular attention to his answers, speech, physical appearance and to the emotions he exhibited. In the past Correa had had occasion to observe defendant when he was under the influence of alcohol. Correa smelled no alcohol on defendant's breath. His eyes looked normal and his answers were accurate and concise, with no slurring of words.

Officer Edwards, who had never seen defendant before the night of his arrest, testified that he noted a slight odor of alcohol on defendant's breath at the time of his arrest and that his eyes were bloodshot. But his speech was coherent, not slurred and he had no trouble walking to the police vehicle with his hands handcuffed behind his back. Edwards, however, thought that defendant "was under the influence of alcohol but not to the point of intoxication."

Upon being asked on cross-examination if there was any conversation with defendant about the advisability of making a statement, Edwards testified that one of the officers told defendant that for his own personal satisfaction and relief, it would probably be a good thing if he got what he had on his mind off of his chest; that this was all he was told.

Edwards further testified that, before the interview, defendant had been told that Thomas Brown had been arrested and had made a statement implicating him.

Extensive expert medical testimony was introduced respecting defendant's capacity to understand and intelligently waive his constitutional rights. Two of the three psychiatrists appointed by the court to examine defendant were of the opinion that he was competent to make an intelligent waiver if he was not at the time under the influence of drugs or alcohol. The third doctor, who diagnosed defendant as a "schizoid personality, moderately severe," concluded that because of his "unpredictable intellectual functioning," defendant, "at certain times," even without drugs or alcohol, could not intelligently waive his rights, but "at other times he could." All of the doctors were of the opinion that defendant had at least average intelligence.

No defense was presented on the merits.

Defendant, testifying on the issue of the admissibility of his confession, related that he took several seconal tablets, drank wine and beer, and smoked marijuana just prior to his arrest; that he was on "a combination high" of seconal and marijuana when he was taken to the police station; he could not recall everything that happened there; he was "not sure" but thought he was advised of his rights; he "wasn't paying too much attention."

Defendant later testified on cross-examination that he knew what he was arrested for; that he remembered being advised of his rights before he was questioned by the officers; however, that, "I wouldn't exactly say I fully understood them"; he was not able to say "for sure" that he knew he had the right to an attorney; he did not know that he did not have to say anything; he remembered making a statement which he was aware was being recorded; he remembered having been advised of his rights by Lieutenant Correa in 1966.

As to why he decided to confess to Officer Edwards, defendant related: "I was talking to him mainly because he had told me someone else had told him, another young man in the party, had told him what had happened, and he said because he would—you know, go ahead and get it off my chest." Defendant further related that he did not think the officer had told him he had to make a statement because Brown had talked. Another officer told him earlier, "something about, 'why don't you go and tell us, it will be better off for you and it will help you later on if you tell us now what hap-

pened.' '' He told that officer he did not want to talk. About an hour later, however, after he heard about Brown, he changed his mind.

Donald Wright, who was arrested with defendant, corroborated defendant's testimony that he was smoking marijuana, ''dropping pills'' and drinking wine before his arrest. Darryl Redick, who resided at the location where defendant was arrested, testified he saw defendant take two seconal tablets shortly before the police arrived and that he saw him drinking beer and wine earlier in the day.

■ At the outset of our discussion, recognition must be given to the rule that it is largely the function of the trial court to resolve factual conflicts in the evidence. This rule applies to conflicts with respect to the question whether a defendant's confession was voluntary, and to whether he knowingly and intelligently waived his constitutional rights to silence and counsel before making it. (*People* v. *Midkiff*, 262 Cal.App.2d 734, 739 [68 Cal.Rptr. 866] ; *People* v. *Valencia*, 249 Cal.App.2d 370, 377 [57 Cal.Rptr. 567].) The trial court's determination on such issues will not be disturbed on appeal unless it is ''palpably erroneous.'' (*People* v. *Stafford*, 240 Cal.App.2d 422, 424 [49 Cal.Rptr. 598].; *People* v. *Midkiff, supra*, at p. 739 ; *People* v. *Valencia, supra*, at p. 377.)

■ Defendant maintains that his confession was induced by police threats and promises and was therefore involuntary. He points to his testimony that an officer told him ''something about, 'why don't you go and tell us, it will be better off for you and it will help you later on if you tell us now what happened.' '' Officer Edwards, however, testified that all defendant was told was that, for his own personal satisfaction and relief, it would ''probably be a good thing if he got what he had on his mind off of his chest.'' The court resolved the conflict in the testimony, choosing to believe the officer's account of what transpired. ■ A policeman's advice or exhortation to an accused to ''tell the truth'' or that ''it would be better to tell the truth,'' where accompanied by neither threat nor promise, does not render involuntary a subsequent confession. (*People* v. *Hill*, 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908].) ■ Since the advice defendant was given was unaccompanied by any threat or promise, it did not constitute an improper inducement.

It was not an improper inducement for the officers to inform defendant that his confederate had confessed. ■ ''Good faith confrontation with the confessions of other accom-

plices is an interrogation technique possessing no apparent constitutional vice.'' (*People* v. *Lantz,* 265 Cal.App.2d 5, 8 [fn. 4] [71 Cal.Rptr. 188] ; see also *People* v. *Hill, supra,* at p. 548 and *People* v. *Schwartzman,* 266 Cal.App.2d 870, 885 [72 Cal.Rptr. 616].)

On the issue of whether he knowingly and intelligently waived his constitutional rights, defendant initially contends that since he was a 17-year-old juvenile, he was incapable, as a matter of law, of giving a valid waiver in the absence of his parents, or in the absence of proof that they were first advised of his rights and given the opportunity to consult with him. The point has been decided adversely to defendant's position by our Supreme Court in *People* v. *Lara,* 67 Cal.2d 365, where the court said (at pp. 378-379 [62 Cal. Rptr. 586, 432 P.2d 202]) : ''We cannot accept the suggestion of certain commentators [citations omitted] that every minor is incompetent as a matter of law to waive his constitutional rights to remain silent and to an attorney unless the waiver is consented to by an attorney or by a parent or guardian who has himself been advised of the minor's rights. Such adult consent is of course to be desired, and should be obtained whenever feasible. But as we will explain, whether a minor knowingly and intelligently waived these rights is a question of fact; and a mere failure of the authorities to seek the additional consent of an adult cannot be held to outweigh, in any given instance, an evidentially supported finding that such a waiver was actually made.''

The court, thereafter, concluded (at p. 383) : ''[T]he admissibility of such a confession depends not on his [defendant's] age alone but on a combination of that factor with such other circumstances as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement.''

Defendant maintains that the circumstances show he did not intelligently waive his rights. We do not agree. As the statement of the facts so plainly demonstrates, before he confessed, defendant had been repeatedly and painstakingly instructed on his rights by the investigating officers. Defendant was shown to be a criminally sophisticated 17-year-old who had had numerous brushes with the law in the past. On at least three of those occasions he had been advised of his rights and on one occasion had elected to remain silent.

The weight of the medical opinion was to the effect that

defendant had no mental defect which would prevent him from giving an intelligent waiver. The testimony of Lieutenant Correa, the one officer who had the advantage of having observed defendant in the past (and on occasions when he was intoxicated), provides ample support for the finding that defendant was not at the time under the influence of drugs or alcohol.

On top of this evidence, defendant admitted on the stand that he had been told what he was charged with; that he knew the seriousness of the situation; that he remembered being advised of his rights; and that, to a certain extent, he understood his rights "although he knew more about them now."

Contrary to defendant's suggestion, the record need not show that the officers had specifically asked him, in so many words, if he "waives" the rights explained to him. ■ Where the record supports the finding that a defendant, who is competent to waive his rights, was advised of his rights and, having them in mind, chooses to make a statement, that is sufficient. (*People* v. *Lara, supra,* 67 Cal.2d 365, 376; *People* v. *Samaniego,* 263 Cal.App.2d 804, 810 [69 Cal.Rptr. 904].) ■ Here, defendant was asked if he desired to continue the interview, having just been advised of his rights. He responded that he wanted to talk. Whereupon, he made his confession.

Defendant complains because, prior to his confession, he was not told the penalty for murder and that he could be treated as an adult rather than a juvenile, and further, because he was not instructed on the felony-murder rule and the law making an accessory a principal in the commission of a crime. In rejecting a similar complaint by one of the defendants in *People* v. *Lara, supra,* the court stated (at p. 376): "There is no requirement that an accused be informed of these matters while the case is still in the stage of interrogation by investigating officers. Indeed, it would usually be impossible to do so, for at that stage no crimes have yet been 'charged against him'; the latter decision is subsequently made by the district attorney, after appraising the legal effect of the evidence gathered from all sources in the case." (See also *People* v. *Bettis,* 269 Cal.App.2d 692, 696 [75 Cal. Rptr. 158]; *People* v. *Roman,* 256 Cal.App.2d 656, 660-661 [64 Cal.Rptr. 268].)

We conclude that the evidence overwhelmingly supports the finding of the trial court that defendant knowingly and intel-

ligently waived his constitutional rights. His confession was therefore properly admitted in evidence against him.

The judgment is affirmed.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied July 8, 1969, and appellant's petition for a hearing by the Supreme Court was denied August 27, 1969.