Joseph Raines was indicted for robbery in the first degree, in violation of § 13A-8-41, Code of Alabama 1975, and was found "guilty of robbery as charged in the indictment" by the jury.
After a hearing by the trial court, in accordance with the Habitual Offender Act, the appellant was sentenced to life imprisonment without parole.
Nancy Gale Rushen was the manager of a Shop-a-Snak convenience store in Jefferson County on January 20, 1981. On that day at approximately 12:30 p.m., a man entered the store and requested a certain kind of shaving cream, which Ms. Rushen informed him was not then in the store's stock. At that point, this man brought several items to the counter and Ms. Rushen rang up the cost on those items. After this, the man ordered her to "put the money in the bag." (R. 42). After he made this statement three times, this man (appellant) placed his hand on the handle of a pistol stuck in his pants. Ms. Rushen removed $125 from the cash register and put it in the bag, which contained the items that the appellant had selected.
Then he said, "Now, come out, and let's go to the back." (R. 43). He assured her that he was not going to hurt her, and then he ran out the door. Ms. Rushen identified the appellant during the trial as the man who robbed her that day.
On that same day, Meredith Moody was working in the building next door to the Shop-a-Snak. She observed a man enter the Shop-a-Snak and then leave a few minutes later with a gun in his pants.
She told Jerry Dill, the mailman, that the Shop-a-Snak had just been robbed. Dill saw a man running between the building in which Ms. Moody worked, and the next building. He pursued the man and saw him get into a bluish-gray late 1960's model Chevrolet with a Florida license tag number RPD 923.
On January 26, 1982, at approximately 12:03 a.m., the appellant was stopped by the police in Flagstaff, Arizona. Apparently, at this time, the appellant had not violated any laws. At some point during this period, the police officer in question ran a check on the appellant's vehicle (Florida tag number RPD 923) with the National Crime Identification Center (NCIC) and discovered the car had been reported stolen.
The appellant was taken into custody at this time and was advised of the charges *Page 208 
against him, and he was given his Miranda warnings. He signed a written waiver of his Miranda rights.
Detective Joseph James of the Flagstaff Police Department questioned the appellant the next day concerning his involvement in an armed robbery in Birmingham, Alabama, and the appellant initially said he didn't know anything about this robbery. James then informed the appellant that Sergeant Miller of the Birmingham Police Department had informed him that there were several eyewitnesses to the robbery and someone had obtained the appellant's Florida tag number. He then asked the appellant to consider these facts.
After the two had talked for approximately forty-five minutes about various topics, the appellant told James, "I want to give you a statement." (R. 128). James testified the appellant stated that:
 ". . . times were bad for him, that he was having a lot of problems, that he wanted to see his three year old son in California pretty bad, so he left Florida. He had very little money. When he got to Birmingham he needed some money. He saw the store, he saw that there were very few people in the store, so he parked his car at the restaurant. He didn't know whether it was a Denny's or Sambo's or what the name of the restaurant was, but he parked his car there — let me sort of fix a picture in your mind here. As he described it to me, there is a restaurant here and then a bank next to the restaurant and then the store was on the other side, so he walked past the bank over to the store. He walked inside the store and saw the lady was there by herself. He looked around the store, saw that there was nobody else in the store, then he walked up to the lady and he says, `I want the money.' He then placed his hand on a pistol that he carries in the front of his pants. He put his hand on the butt of the pistol. It was his right hand that he placed on the butt of his pistol. At that time the lady opened the cash register and she took out the money and she placed it in a paper bag. Mr. Raines stated that he didn't know exactly how much money it was. He said that he never counted it, he figures about $150. He described the girl that he robbed as having black hair that was combed back. Her hair was combed back. She was about five-six, she was a white girl and she was slender. Mr. Raines stated that as soon as he obtained his money, then he left the store and as he left the store that there was a pick-up truck that pulled up. I asked him if there was anything particular about the way the pick-up truck pulled up. He said, `No, it was just a normal customer that pulled up to the store, that drove up there and pulled in.' He stated that he then left the store, he went up to Highway 20 and then continued his tour on to California." (R. 128-129).
The appellant also told James that the pistol found in his vehicle after interrogation was the same one he had used during the robbery in Birmingham.
Sergeant Miller went to Flagstaff and brought the appellant back to Jefferson County. The appellant was again given hisMiranda warnings and he signed a waiver of his Miranda rights. He told Sergeant Miller that he had committed the robbery in question, but that he had already given Detective James his statement and didn't want to talk about it anymore.
Some time later, Sergeant Miller showed Ms. Rushen six photographs in order to allow her to attempt to identify the man who robbed her. After studying the photographs, Ms. Rushen chose the appellant's photograph and said, "This looks just exactly like him." (R. 56). She then admitted she was not absolutely positive.
On March 4, 1981, the day of the appellant's scheduled preliminary hearing, Ms. Rushen positively identified the appellant as the man who robbed her on January 20, 1981.
 I
The appellant contends that the State failed to show that the arresting officer in Flagstaff, Arizona, who originally stopped *Page 209 
the appellant, had probable cause to do so, and therefore, the defense's motion to suppress the evidence was improperly denied.
The appellant's contention that his confession was the fruit of an illegal stop is without merit.
There was conflicting evidence presented at trial as to whether the appellant's license tag was checked with the NCIC before or after he was stopped. Detective James testified that he was not the officer who stopped the appellant but that he had examined the official police report and determined the NCIC check was run before the appellant was stopped. His testimony was as follows:
"VOIR DIRE BY THE STATE
"BY MR. SOWA:
 "Q From the officer's report were you able to determine why they stopped the car Mr. Raines was driving?
"A Yes, sir.
"Q What was that reason, sir?
 "A They were noticing the out of state plates driving at the time of three minutes after midnight, and his rather than going five miles over the speed limit he was going ten miles under the speed limit.
"MR. LYON: Under?
"A Yes, sir.
 "Q (By Mr. Sowa) Was he stopped for a traffic violation, or for what?
 "A He was stopped because the officer ran his plate and received a hit on it.
"Q Through what, sir?
"A Through the National Crime Identification Center.
"Q A hit for what, sir?
 "A The vehicle which he was driving was reported stolen out of Florida. (R. 83).
"VOIR DIRE BY THE DEFENSE
"BY MR. LYON:
 "Q Officer James, you've got some notes there from the officer who pulled over Mr. Raines?
"A I have the report, yes, sir.
"Q Could I see that report?
"A Certainly.
 "Q Could you refer me to that section that goes to my client being pulled over.
 "A The report number would be Flagstaff Report No. DR, No. 81-0916 on page two. On the first paragraph it says on 1-26-81 at approximately 0003 hours, RO, traveling westbound on Sante Fe Avenue when I observed a vehicle, blue Chevvy Florida license plate, RPD 923, traveling 25 miles per hour in a 35 miles per hour zone.
"Q What does RO stand for?
"A Reporting Officer.
 "Q Now, you don't know whether or not the reporting officer pulled the defendant over and then ran the NCIC check or whether he ran the NCIC check and then pulled him over, do you, those notes don't reflect that, do they?
"A Yes, sir, they do.
"Q Where do they reflect that?
"A The next sentence.
"Q What does the next sentence say?
 "A RO ran warrant check on the vehicle; warrant check revealed the vehicle was stolen in McLean, Baker County, Florida, Warrant No. 102, Date of Crime; Suspect vehicle was stopped at El Rancho Market East. (R. 91-92).
The appellant testified as follows:
"VOIR DIRE BY THE DEFENSE
"BY MR. LYON:
 "Q If I understand this correctly, Mr. Raines, after you were pulled over you were put in the police car and I believe you said he reached for the microphone and the officer said, `I want —
 "MR. SOWA: Object to the leading nature of the question.
 "MR. LYON: I'm just going over what I believed he said, Your Honor.
"THE COURT: Go ahead.
 "Q And you said he wanted to run a check on and he gave the tag number, is that right? *Page 210 
"A Yes, sir.
 "Q And I believe you testified on cross examination that it came back on the radio `Give us that second letter again.'
 "A Yes, the person was a lady that asked for the second letter.
"Q The dispatcher was a lady?
"A Yes, sir.
 "Q And they asked for the tag number while you were in the car?
"A I was in the back seat.
"Q And he gave it to them again, did he not?
"A Yes, he did.
 "Q About five minutes later they got a report back from the Police Department saying that the car was reported stolen?
"A Yes, it was." (R. 108-109).
It is not unusual that conflicting evidence will be presented at trial. When conflicts arise, we must give great weight to the trial court's judgment in such matters. Snider v. State,422 So.2d 807 (Ala.Cr.App. 1982). The trial judge is in a much better position than we are to resolve these conflicts. He listens to the testimony of each witness, observes their demeanor and determines their credibility. This court will uphold the trial judge's decision unless we conclude that his decision was palpably contrary to the great weight of the evidence and manifestly wrong. Snider v. State, supra.
We believe there was sufficient credible evidence contained in the record to allow the trial judge to conclude that the NCIC check was made before the appellant was stopped, and therefore this officer had probable cause to stop the appellant and make an arrest.
Assuming arguendo, that the NCIC check was made after the appellant was stopped and the stop was made without probable cause, we still believe the appellant's statement was not the fruit of the illegal stop.
 "We need not hold that all evidence is `fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is `whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959). Id., [371 U.S. 471] at 487-488, 83 S.Ct., at [407] 417 [9 L.Ed.2d 441]."
Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416, (1975).
 "In Brown v. Illinois, supra, and Dunaway v. New York, [442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824] supra, the police arrested suspects without probable cause. The suspects were transported to police headquarters, advised of their Miranda rights, and interrogated. They confessed within two hours of their arrest. This Court held that the confessions were not admissible at trial, reasoning that a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the casual connection between the illegal arrest and the confession so that the confession is `sufficiently an act of free will to purge the primary taint.' Brown v. Illinois, 422 U.S., at 602, 95 S.Ct., at 2261 (quoting Wong Sun v. United States, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)). See also Dunaway v. New York, 442 U.S. at 217, 99 S.Ct., at 2259." (Emphasis added).
Taylor v. Alabama, 457 U.S. ___, 102 S.Ct. 2664,73 L.Ed.2d 314, (1982).
In Brown v. Illinois, supra, the United States Supreme Court stated that the Miranda warnings are only one factor but an important one to be considered in determining whether a confession has been purged of the taint of the illegal arrest. The other factors to be considered are:
 "[T]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S., at 603-604, 95 S.Ct., at 2261 *Page 211 
(citations omitted); Dunaway v. New York, 442 U.S., at 218, 99 S.Ct., at 2259."
Taylor v. Alabama, supra.
We now consider these factors in light of the case at bar. First, the appellant was given his Miranda warnings at least twice, then he stated he understood them and signed a waiver of such rights prior to making his statement.
Secondly, the appellant was arrested shortly after midnight on January 26, 1981, and gave his statement to Detective James some ten hours later.
Next, there were at least two intervening circumstances present, i.e., the NCIC confirmation and the information received from Birmingham officers concerning the robbery there.
Lastly, the appellant was not subjected to intimidating or abusive police conduct. The police did not break into his home or conduct a search of his vehicle. They merely stopped the appellant, detaining him while running the NCIC check. The police did not gain any information as such, simply by stopping the appellant. The appellant's license tag was clearly visible and they had every right to run the check in question.
When these four factors are considered together, it is clear that there were sufficient intervening events to purge the confession of any illegal taint. The appellant did not confess because he was illegally stopped. His statement was knowingly, intelligently, understandingly, and voluntarily given.
Thus, the trial judge was correct in denying the appellant's motion to suppress his confession.
 II
The appellant contends he was denied due process because his in-court identification was tainted by unnecessarily suggestive out-of-court identification procedures, specifically the photographic line-up and the confrontation on the day of the appellant's scheduled preliminary hearing.
The appellant claims the photographic line-up was unduly suggestive because his photograph was markedly different than the others. He claims he was the only person of Latin American ancestry included in the six photographs and his photograph was lighter in contrast to the others.
In Brazell v. State, 369 So.2d 25 (Ala.Cr.App. 1978), this court stated that:
 "Whether an out-of-court identification procedure has violated due process depends upon the `totality of the circumstances.' Stovall, [388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199] supra; Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247
(1968); Coleman, [399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387] supra; Biggers, [409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401] supra. This totality of the circumstances test is the standard in deciding whether an identification procedure is unnecessarily suggestive and conducive to irreparable mistaken identification. Caver v. Alabama, 537 F.2d 1333 (5th Cir. 1973).
 "In determining the constitutional adequacy of pretrial identification procedures and the admissibility of identification testimony, the central question is whether, under the totality of the circumstances, the identification was reliable. Manson, [432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140] supra. This determination involves the application of a two-pronged test.
 "[T]he required inquiry is two-pronged. The first question is whether the initial identification procedure was `unnecessarily' [Stovall] or `impermissibly' [Simmons] suggestive. If it is found to have been so, the court must then proceed to the question whether the procedure found to have been `unnecessarily' or `impermissibly' suggestive was so `conducive to irreparable mistaken identification' [Stovall] or had such a tendency `to give rise to a very substantial likelihood of irreparable misidentification' [Simmons] that allowing the witness to make an in-court identification would be a denial of due process. United States ex rel. Phipps v. Follette, 428 F.2d 912, 914-915 (2d Cir. 1970)." *Page 212 
The record does not support the appellant's contention that the photographic lineup was unduly suggestive. Sergeant Miller specifically requested the group of photographs from the West Palm Beach, Florida Police Department because he wanted to depict persons of the same nationality. Both Sergeant Miller and Ms. Rushen testified they could not tell that the appellant was of Latin American origin. Ms. Rushen stated that three of the subjects in the photographs (including the appellant) resembled each other so closely, she thought they could be look-alikes. She also testified that when she was shown the photographs, she did not notice the appellant's photograph to be lighter than the others.
Neither do we believe that Ms. Rushen's identification of the appellant at the preliminary hearing was suggestive. Ms. Rushen was sitting in the back of the courtroom and when the appellant and several other people who were dressed alike, were escorted into the courtroom, she immediately identified the appellant. There was never any indication or suggestion made to Ms. Rushen by anyone at the photographic line-up or the preliminary hearing.
We hold that neither of these out-of-court identification procedures were unnecessarily suggestive and therefore the appellant's motion to suppress the evidence based on these procedures was properly denied by the trial judge.
Even had we found the pre-trial identification procedure to be suggestive, it does not necessarily follow that the in-court identification must be excluded. See Dill v. State,429 So.2d 633 (Ala.Cr.App. 1982).
 "Whether an in-court identification has been so tainted by an extrajudicial identification as to vitiate the in-court identification is not to be determined solely by the circumstances of the extrajudicial identification, but all of the circumstances relative to the identification of defendant by the witness are to be taken into consideration, and if it is determinable therefrom that an in-court identification was independent of the extrajudicial identification, evidence of the in-court identification is admissible. Matthews v. State, 361 So.2d 1195 (Ala. 1978)."
Dill v. State, supra.
There are several factors we must consider to determine whether under the "totality of the circumstances" Ms. Rushen's in-court identification of the appellant was reliable even though the out-of-court identification procedures may have been suggestive. The factors are: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal (4) the level of certainty demonstrated by the witness at the confrontation, and, (5) the length of time between the crime and the confrontation. Neil v.Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).
Applying the above factors to the case at bar, we conclude that: (1) Ms. Rushen certainly had ample opportunity to view the appellant during the course of the robbery. He was in the store for several minutes and talked with her from a distance of a few feet. The lighting was good. (2) Ms. Rushen's attentiveness was very acute. She was able to provide a detailed description of the events of the robbery and of the robber. (3) Ms. Rushen gave a detailed description of the appellant which was corroborated by Ms. Moody and Mr. Dill. (4) Ms. Rushen identified the appellant at trial and stated she was absolutely certain that the appellant was the one who had robbed her. (5) Even though Ms. Rushen's in-court identification of the appellant occurred a year after the robbery, she identified the appellant at the preliminary hearing less than two months after the crime.
Ms. Rushen's in-court identification of the appellant was based on her eye witness observation of him during the robbery and was therefore reliable and independent of any pre-trial identification.
The appellant's motion to suppress Ms. Rushen's identification of the appellant was properly denied. *Page 213 
 III
Lastly, the appellant contends that his confession was involuntary and should not have been admitted into evidence. He claims he was coerced into making the statement because Detective James said he would be better off if he confessed.
 "While the slightest menace or threat, or any hope engendered or encouraged that the suspect's case will be lightened, meliorated, or more favorably dealt with if he will confess is enough to exclude a confession thereby superinduced, Womack v. State, 281 Ala. 499, 205 So.2d 579 (1967); Bass v. State, 55 Ala. App. 5, 312 So.2d 576
(1975) such factors were not present here. A policeman's advice or exhortation to an accused . . . `to tell the truth' or that `it would be better to tell the truth', unaccompanied by threat or promise, does not render involuntary the . . . subsequent confession. People v. Robinson, 274 Cal.App.2d 514, 79 Cal.Rptr. 213 (1969)."
Parker v. State, 351 So.2d 927, (Ala.Cr.App.), writ quashed351 So.2d 938 (Ala. 1977).
We have found no evidence in the record that there were any threats or other coercion, inducements or promises made to the appellant in order to obtain a statement from him. After the appellant denied any involvement in the robbery, Detective James confronted him with contradicting evidence and told him to consider these facts.
In Twymon v. State, 358 So.2d 1072 (Ala.Cr.App. 1978), this court stated:
 "Confessions are not rendered inadmissible by reason of having been obtained by propounding to the accused questions assuming his guilt. Curry v. State, 203 Ala. 239, 82 So. 489 (1919); White v. State, 133 Ala. 122, 32 So. 139 (1902)."
This court will not overturn a trial court's finding of the voluntariness of a confession unless his decision is wrong and against the great weight of the evidence. Snider v. State, supra. Therefore, we hold the trial court was correct when it admitted the appellant's confession into evidence and submitted same to the jury.
This case is due to be and is hereby affirmed.
AFFIRMED.
All the Judges concur.