[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 504 
 On Second Return to Remand and On Applications for Rehearing
This court's unpublished memorandum of May 10, 1996, is withdrawn and the following opinion is substituted therefor.
The appellant, Christopher Bishop, was indicted for murder in connection with the death of Tisa Sauceman, which occurred on October 6, 1992. After a trial, the appellant was found guilty of the lesser included offense of manslaughter and subsequently was sentenced to 16 years in the penitentiary.
On appeal, we remanded the case for the trial court to determine whether Bishop had established a prima facie case of racial discrimination in the prosecution's striking of jurors from the venire. See Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). On return to remand, we again remanded the matter for a hearing to elicit from the State its reasons for striking of 8 of the 14 black members on the jury venire.
On the second return to remand we affirmed, by unpublished memorandum, the circuit court's ruling on the Batson issue, based on the rule in Purkett v. Elem, 514 U.S. 765, ___,115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). We failed, however, to address four other issues raised by appellant on appeal. In his application for rehearing, the appellant has asked us to address these issues, which we do below. The State's application for rehearing advised us of mis-statements made by appellant regarding the race of certain veniremembers upon which we relied in our prior opinions discussing the Batson
issue. Additionally, the Alabama Supreme Court has recently emphasized that the rule in Alabama differs substantially from the rule set out in Purkett. Ex parte Bruner, 681 So.2d 173
(Ala. 1996).
 I.
The appellant contends that the trial court erred in ruling that the prosecution's reasons for striking 8 of 14 black veniremembers were race neutral and did not violateBatson and its progeny. The following reasons were given by the State for striking black veniremembers:
"1. Juror No. 52 — [S.W.] *Page 505 
 The State stated that voir dire disclosed that this juror knew Melissa King, with whom Defendant had a relationship, with whom defendant had spent the night and who was in court with Defendant. This juror also had heard that Tisa Sauceman, the alleged victim, was cleaning a pistol and it went off, shooting her in the head. Moreover she stated that she would choose what her church teaches, that the Lord should do the judging, rather than what the law says.
"2. Juror No. 47 — [K.S.]
 The state stated that voir dire revealed that this juror also knew Melissa King and that said juror lived at Sandpiper Apartments (where Melissa King lived). She also had heard about the case and specifically that Tisa Sauceman was dusting her nightstand and the gun accidentally went off or fell. She also knew Defendant, who had delivered furniture to her house.
"3. Juror No. 41 — [M.R.]
 The State stated that voir dire revealed that this juror had heard that the alleged victim, Tisa Sauceman, had killed herself, that she knew defendant's girlfriend, Melissa King, and that she knew Defendant, who had delivered furniture to her house several times. She also expressed her opinion that the case needed more investigation.
"4. Juror No. 35 — [M.P.]
 The District Attorney stated that his office had prosecuted a child support case against this juror (and that he struck juror number 22, M.L., a white, for this same reason).
"5. Juror No. 61 — [F.H.]
 The District Attorney stated that this juror had recently (prior to trial) been sued on a past due account by Pickens County Medical Center, and that he planned to call (and in fact, did call) three witnesses from the staff of that Medical Center, Doctors Curry and Gentry and Nurse Mary Smith. He stated that he struck juror number 48, a white, for partly the same reason.
"6. Juror No. 4 — [P.C.]
 The District Attorney stated that voir dire
disclosed that this juror had heard about the case and that her brother worked for Ira B. Colvin, one of the attorneys who assisted Defendant in striking the jury.
"7. Juror No. 59 — [M.F.]
 The State stated that from voir dire it learned that this juror['s daughter] went to high school with Defendant and that she had heard her daughter talk about him. The State also disclosed that family members' relationship to Defendant was a factor in its striking juror number 69, a white.
"8. Juror No. 20 — [E.L.]
 The District Attorney stated that this juror did not respond to any voir dire inquiries, that she was 72 years old and was the oldest veniremember at this point (the Court finds from the record that she was the State's last strike and served as an alternate) and that he was concerned with her attentiveness and/or comprehension in what he expected to be a complex, circumstantial case. He also stated that several police officers would be testifying in the case, and that she had complained frequently to [city of] Reform police about control problems with her children. He also speculated that she surely knew attorney, Colvin, the Reform city prosecutor, but did not respond when the venire was asked if any of them knew Mr. Colvin."
The proponent of a strike has "the burden of articulating a clear, specific, and legitimate reason for the challenge that relates to the particular case to be tried and that is nondiscriminatory." Millette v. O'Neal Steel, Inc.,613 So.2d 1225, 1229 (Ala. 1992); see Batson, supra, and Ex parte Bird,594 So.2d 676 (Ala. 1991).
Appellant asserts that veniremembers S.W, K.S., and M.R were struck solely on the basis of their race. The state gave as reasons for these strikes the fact that these veniremembers stated that they knew the appellant's girlfriend and their knowledge and already formed opinions as to disputed facts in the case. Additionally K.S. and M.R. were also acquainted with the defendant. The fact that each of these witnesses had also independently formed opinions regarding the case that were consistent with the appellant's defense strategy leads us to believe *Page 506 
that these three strikes were not racially motivated and did not violate the appellant's right to a fair trial.
The reason given for striking veniremember M.P. was that the State had prosecuted him for failure to pay child support. The State also noted that it had struck number 22, M.L., a white male, for the same reason. The State's concern that a potential juror may be biased against it because it pursued a child support prosecution is a legitimate reason for striking that juror. Clearly, the State did not exercise the strike in a racially discriminatory manner because a white veniremember was struck for the same reason.
The State's reason for striking F.H. was that the hospital where three prosecution witnesses were employed had recently sued her for payment on an allegedly past due account. The State also struck a white veniremember, number 48, J.T., for the same reason. The State's concern over F.H.'s possible bias against its witnesses is a clear, specific, and legitimate reason for the strike. It does not appear that the strike was exercised in a discriminatory manner.
The State contends that it struck M.F. because her daughter had gone to the same high school as the appellant and that she had heard her daughter talk about him. The State's concern over possible bias of the witness based on her daughter's acquaintance with the appellant, when combined with the fact that a white veniremember, J.S., was struck because of his relationship with a family member of the appellant, leads us to believe that the strike was race-neutral.
The stated reason for the prosecution's striking of P.C. was that she had heard about the case and that her brother worked for an attorney who assisted the defense in striking the jury. We find that this is a race-neutral reason for the strike.
The State cited several reasons for striking E.L.. Among the reasons was the State's concern that she did not answer any questions posed to her during voir dire examination. The State went further to explain that, at age 72, E.L. was the oldest member of the venire. The State contends that these facts led them to believe that she would be inattentive during the trial or have trouble comprehending all of the evidence. The State also was concerned about E.L.'s perception of their police witnesses due to the fact that she had had occasion to deal with the police after registering complaints about her children. The fact that a veniremember is "inattentive, hostile, or impatient, or is evasive or ambiguous when answering questions" may be a sufficiently race-neutral reason for striking that veniremember. Brown v. State, 623 So.2d 416
(Ala.Crim.App. 1993). Also, in certain cases age may be a legitimate racially neutral reason for exercising a peremptory strike. Ex parte Bird, 594 So.2d 676, 682-683 (Ala. 1991). These two reasons advanced by the State for striking E.L. viewed in isolation are weak given the fact that another elderly black veniremember, N.H., was not struck although he also failed to answer any voir dire questions. However, when these reasons are combined with the State's concern regarding her prior dealings with the police, we conclude that the State did not violate the appellant's right to a fair trial in striking E.L.
The State's explanations for the above strikes are clear, specific, legitimate, and in compliance with the standard set out in Millette. Therefore, we affirm the judgment of the trial court as to this issue.
 II.
The appellant argues that the trial court erred in denying his motion to exclude the State's evidence because he says that the State failed to present a prima facie case against him. The State presented purely circumstantial evidence. Appellant moved to exclude the State's evidence at the close of the State's casein-chief, alleging that there was insufficient evidence linking him to the murder of the victim. Although the actual motion denied by the court was a motion to exclude the evidence, we will treat the appellant's argument as we would treat a motion for acquittal based on insufficiency of the evidence as this appears to have been the argument advanced both at trial and on appeal. *Page 507 
In deciding whether there is sufficient evidence to support the verdict of the jury, the evidence must be viewed in the light most favorable to the prosecution. Cumbo v. State,368 So.2d 871 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979); Faircloth v. State, 471 So.2d 485 (Ala.Cr.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985). A defendant's guilt may be proven and his conviction sustained by circumstantial evidence in conjunction with other facts. Jones v. State, 514 So.2d 1060
(Ala.Cr.App.), cert. denied, 514 So.2d 1068 (Ala. 1987).
At trial, the appellant's defense was based on two main theories. He maintained that the victim's death was either accidental or that it was the result of suicide. During the State's case-in-chief, several witnesses gave testimony that suggested that Tisa Sauceman's death was neither an accident nor a suicide.
Dr. Kenneth Warner, the forensic pathologist who performed the autopsy, testified that the gunshot wound to the victim's head was most likely caused by a pistol shot from a distance greater than two feet away and that the manner of death was homicide. (R. 425-31.) There was conflicting testimony from two doctors who initially treated the victim as to the distance from which the weapon that fired the fatal shot was discharged; however they testified that neither of them had expertise in pathology and that they would defer on this matter to the findings of the pathologist.
David Higgins, a firearms expert who examined and tested the gun which fired the shot which killed Sauceman, testified that there were safety mechanisms on the gun to prevent it from firing accidentally as the appellant claims happened. He testified that various tests were performed on the gun to determine its susceptibility to fire when dropped and that all of these tests failed to cause the gun to discharge. (R. 471-72.) Additionally, a doctor who treated the victim testified that the wound was not the result of a pistol falling from a table and discharging. (R. 644-645.)
There was little evidence to suggest that the victim committed suicide. All of the witnesses, including the appellant, who knew the victim testified that she had not been despondent before her death. As stated above, the only evidence to suggest a possible suicide was the testimony of the two treating physicians as to the distance the gun appeared to have been discharged from the victim's wound. Both of these physicians also testified that they were not qualified in the field of forensic pathology and agreed that Dr. Warner was more qualified than they to give an opinion as to the distance from which the gun discharged.
Additionally, there was evidence introduced throughout the trial that suggested that the appellant and the victim had had violent arguments in the past. Several State's witnesses pointed out inconsistencies in the appellant's story about what had occurred on the night of Tisa Sauceman's death. The evidence was also uncontroverted that appellant was the only person with the victim when she was shot.
It is not the province of this court to reweigh the evidence.Walker v. State, 416 So.2d 1083 (Ala.Crim.App. 1982). As a rule this court will uphold the trial judge's decision judgment based on a jury verdict unless that decision was palpably contrary to the weight of the evidence and manifestly wrong.Raines v. State, 428 So.2d 206 (Ala.Crim.App. 1983); Watkinsv. State, 565 So.2d 1227 (Ala.Crim.App. 1990). The denial of the appellant's motion to exclude the evidence was proper in this case.
 III.
The appellant alleges that the trial court erred in allowing the State's forensic pathologist, in his testimony, to draw a conclusion allegedly beyond his area of expertise. We hold that he has not preserved this issue for review.
The pertinent portion of the record reads as follows:
 "[Prosecutor, Mr. Johnson]: Dr. Warner, I want to ask you, what has been admitted into evidence — I want to ask you to refer to a portion of what has been admitted into evidence as State's exhibit 42 and ask you to assume that if this is a test pattern fired *Page 508 
by this pistol at a distance of 12 inches, if this weapon had been fired at that distance at Tisa Sauceman, if the weapon would have produced stippling in that same or similar pattern?
 "[Witness, Dr. Warner]: Well, you know, this is really not in my expertise. This is cloth and I can't tell when cloth is burned, but that could be powder or burn. I can't say.
 "[Prosecutor]: Was anything like this — any stippling pattern present on the body?
 "[Defense counsel, Mr. Sogol]: Judge, I'm going to object to that. That is not a stippling pattern. That was a powder pattern as was clearly testified to by Mr. Higgins that that was a loose powder pattern on there and not a stippling pattern.
 "[Prosecutor]: You didn't let me finish my question.
 "[Defense Counsel]: Well, you keep calling it a stippling pattern and it's not.
 "[Prosecutor]: No. I said 'was there any stippling pattern' — If you'll let me finish. Was there any stippling pattern present on the body of Tisa Sauceman in the temple area similar to that test pattern.
 "THE COURT: I'll let the doctor decide whether or not he can answer the question.
 "[Prosecutor]: Was there any stippling pattern present on her, Doctor, like this, in that fashion?
"[Defense Counsel]: Object to the question, Judge.
"[Witness]: Well, there was no stippling, period.
"THE COURT: Overruled.
"[Defense counsel]: We except.
"[Witness]: There was no stippling."
(R. 742-44.)
The appellant's only objection was specifically to the State's classifying the pattern on the cloth as a stippling rather than a powder pattern. There is nothing in the record that suggests that the appellant objected on the basis that Dr. Warner was testifying outside of his area of expertise, even after Dr. Warner explicitly stated that the line of questioning was outside his expertise.
The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial. State v. Holloway,293 Ala. 543, 307 So.2d 13 (1975); Murray v. State, 494 So.2d 891
(Ala.Crim.App. 1986); Ex Parte Frith, 526 So.2d 880 (Ala. 1987); C. Gamble, McElroy's Alabama Evidence, § 254.01(3) (5th ed. 1996).
 IV.
The appellant argues that the trial court erred in allowing a witness to testify as to uncommunicated mental operations of the victim.
The testimony to which the appellant objects occurred during the state's direct examination of a co-worker of the victim. The witness testified that she had known the appellant and the victim and that she had had an opportunity to observe their behavior when two certain male customers would drive through the window at the bank where the victim worked. She had testified that the appellant would stand across from the victim's bank window and glare at her as she attended to these particular customers. The following testimony occurred after she was asked about the victim's behavior when she would see these two customers approaching the drive-through window:
 "A: [Ms. Bolling] If she would see them coming in advance, she would ask one of us to please go and wait on them for her.
"Q: [Mr. Moore, for the state] Would she say why?
"A: She wouldn't say why. We knew why.
 "[Defense Counsel] MR. SOGOL: I'm going to object to what they knew.
"A: That [the appellant] was jealous of her.
 "MR. SOGOL: I'm going to object to what she knew, Judge.
"THE COURT: Overruled.
"MR SOGOL: I except.
"THE COURT: I think I understand the statement.
 "MR SOGOL: It's an uncommunicated mental process on the part of this witness. We object to that, Your Honor. *Page 509 
 "THE COURT: Well, what she's now communicating to you a mental process which was — that was not necessary that it be verbalized. She's simply saying, 'I knew why'.
 "MR. SOGOL: She's saying she knew what another person was thinking. That's what she's asked to testify to.
 "MR. MOORE: No. I asked her why — what she knew, what Melissa knew of that was happening, what the situation was. What was that?
 "MR. SOGOL: Judge, she's about to go into something that involved two other people's relationship that she's supposing what the truth was. She can testify to what she saw. She can describe that, but I don't think she can testify to her conclusions about what was the underlying basis of their behavior.
 "THE COURT: I believe that if in her opinion she knew the situation, I think that she can testify to it.
"MR SOGOL: I except, Your Honor.
 "Q: Let me try to ask it a better way. Were there occasions when these — Keith and Randy would drive up and she would ask you or somebody else to please come take her place there?
"A: Uh-huh.
 "Q: All right. Did she discuss the reason — Did you hear her give a reason why she wanted you to do that?
 "A: I don't remember her ever saying, but we just —
"Q: You knew?
"A: Or I knew. That was my opinion.
"Q: Okay. What was that reason —
 "MR SOGOL: Same objection, Judge. she's applying her intuition to another person's actions, same objection.
 "THE COURT: She is conveying by testimony her observation of a situation, which I believe that the human being is intelligent enough to draw certain conclusions.
 "MR. SOGOL: Judge, I believe she's about to testify as to why a different person was acting in a certain way, why a different person. I don't think this witness is qualified to testify to that. Does she know why Tisa acted in a certain way? That's the question. and that's my objection. And rather than interrupt every time he asks —
 "MR. MOORE: That's not what I asked. I asked what was happening.
 "MR. SOGOL: She's testified to what was happening. You asked her did Tisa ever tell why she did that.
 "MR. MOORE: And she said no. I said, 'Why did you do it?'
 "MR. SOGOL: No. You said 'Why did she do that, why did Tisa do that?' That was your question.
 "MR. MOORE: That. That ain't why. She tried to answer three times. She knew why and I said why.
 "MR. SOGOL: Wouldn't — why Tisa wouldn't wait on them?
"MR. MOORE: Yeah.
 "MR. SOGOL: The reason that Tisa would not wait on them is not in this witness's ability to testify to. She can testify Tisa didn't wait on them. She can describe what Tisa did, but Tisa's reasons she had for not wanting to wait on those people is beyond this witnesses scope. That's my objection.
(R. 547-50.)
We hold that the appellant's objection to the witness's testimony regarding the undisclosed mental status of another person, should have been sustained. A witness may not testify to the uncommunicated mental operations of another.Flanagan v. State, 369 So.2d 46, 50 (Ala.Crim.App. 1979). Although the trial court erred in allowing the witness's testimony over objection, we hold that it was harmless error. The evidence was offered to show that appellant was jealous of the victim. The testimony objected to, however, was not the only evidence from which the jury could have inferred the appellant's jealousy. The appellant himself on direct examination by defense counsel admitted to being jealous. (R. 694) Other testimony to this effect can be found throughout the record. (R. 492-94, 503, 534, 554-55, 666.) Appellant cannot show that the error caused him any substantial injury beyond that caused by other testimony properly admitted. *Page 510 
We will not reverse the judgment of the trial court based on harmless error. Rule 45, Ala. R.App. P.
 V.
The appellant contends that the trial court erred in sentencing him. Specifically, he argues that the term of imprisonment to which he was sentenced for his conviction of manslaughter was excessive. As ground for his contention, appellant states that in light of a favorable presentence report prepared by Probation Officer Frank McMillan, the 16 year sentence was excessive.
There is nothing in the record to indicate that appellant either objected to the sentence, filed a motion for a new trial, or filed a motion to reconsider his sentence with the trial court. We may review only matters on which adverse rulings have been invoked at the trial court level. Moore v.State, 457 So.2d 981 (Ala.Crim.App. 1984), cert. denied,470 U.S. 1053, 105 S.Ct. 1757, 84 L.Ed.2d 820 (1985); Cano v.State, 543 So.2d 724 (Ala.Crim.App.), cert. denied,493 U.S. 934, 110 S.Ct. 325, 107 L.Ed.2d 315 (1989). Therefore, we hold that appellant has failed to preserve the issue for our review.
For the foregoing reasons, this court affirms the judgment of the trial court.
UNPUBLISHED MEMORANDUM OF MAY 10, 1996, WITHDRAWN; OPINION SUBSTITUTED; APPLICATIONS FOR REHEARING GRANTED; RULE 39(k) MOTIONS DENIED; AFFIRMED.
All the Judges concur.